■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT NELSON, Appellant. — Judgment, Supreme Court, New York County (Martin Rettinger, J., at sentence; Beatrice Shainswit, J., at suppression hearing), rendered

on October 14, 1983, affirmed for the reasons stated by Shainswit, J., at Trial Term. The case is remitted to the Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (subd 5). Concur — Kupferman, J. P., Sullivan and Silverman, JJ.

Carro and Alexander, JJ., dissent in a memorandum by Alexander, J., as follows: Because it is clear that the police testimony as to the events that transpired immediately preceding the defendant's arrest for criminal possession of a weapon in the third degree (Penal Law, § 265.02, subd [4]) "has all appearances of having been patently tailored to nullify constitutional objections" (*People v Garafolo*, 44 AD2d 86, 88) and should not be credited, I would reverse the defendant's conviction, grant the motion to suppress and dismiss the indictment. Police Officer Joseph Kelly, the People's only witness at the suppression hearing, testified that he and two fellow officers, Steve Alu and William Underwood, were patrolling the area of East 115th Street and Park Avenue in upper Manhattan in a yellow medallion cab on December 10, 1982. Kelly and his fellow officers were members of the Street Crime Unit, described by him as "[a] plain clothes unit that rides around in taxicabs, unmarked cars, looking for crimes that are in progress on the street." ¶ Kelly testified that at about 5 P.M., he noticed a vehicle occupied by three males slowly traveling westbound on 115th Street. The officers followed the vehicle for about a block and a half. Kelly, who was driving the taxicab, said that he observed that the left rear taillight of the vehicle was out. He pulled alongside the vehicle, displayed police department identification and told the driver to pull over. Kelly further testified that during this encounter, he "made eye contact with the defendant" who was seated in the rear of the other vehicle on the passenger side and the defendant quickly turned away without turning back. As Kelly, Underwood and Alu approached the stopped vehicle, Kelly from the driver's side and Underwood and Alu from the passenger's side and the rear, defendant is said to have acted in a "nervous manner * * * [l]ooking back to the left as I'm approaching; looking to the right as police officer Underwood approached. Looking around, moving, fidgety". ¶ As the driver of the vehicle went to the rear to show his license and registration to Officer Alu, the defendant is said to have thrown a bag to the floor and in response to Kelly's inquiry concerning its contents, the defendant stated that it contained money and flipped it to Kelly across the front seat. The bag resembled a night deposit bag. Kelly opened it, saw that it in fact contained money and returned it to defendant. In addition, Kelly saw something wrapped in cardboard on the floor next to defendant, which turned out to be panes of glass defendant had just picked up from a glazier on Second Avenue. Officer Kelly testified that he then noticed that "[d]efendant kept his left arm very stiff and tight to his body." He ordered the defendant out of the car and as the defendant exited toward Officer Underwood on the passenger side of the vehicle, Officer Kelly said he saw an object protruding out from under the defendant's armpit. He said he was unable to identify the object and that he was only able to see it because the defendant's open jacket caught on "the window part of the door", exposing the object to view. Kelly called to his partner: "Billy, he has got something", and saw Officer Underwood take the defendant out of the car. Kelly testified on direct examination that the next thing he saw was Officer Underwood with a gun in his hand. He gave no indication how it got there. However, when asked on cross-examination who searched the defendant, he testified that Officer Underwood "reached and came up with a gun". Officer Kelly stated that as Officer Underwood retrieved the gun Underwood exclaimed "I got one". The defendant was then placed under arrest. ¶ Officer Underwood was called to the stand by defendant. He testified that *after* the defendant exited the vehicle, he grabbed him but saw no weapon. He then searched the defendant, apparently by a pat-

down, felt a gun and seized it. ¶ The defendant's version of the incident differed in significant respects from that of Officer Kelly. He testified that he was returning from the East 80's where he had purchased two pieces of glass, when the car in which he rode was stopped by two unmarked vehicles. He stated that he and the other occupants were set upon by four or five officers who searched the driver and the front seat passenger. Then, after he moved the glass which he held on his lap, he was pulled from the car and searched. Defendant denied having heard any conversation with respect to a defective taillight. All he heard was "get out of the car" and "put your hands up on the roof". Further, he denied having a bag of money that he flipped to the officer. He claimed that he had some $3,000 of gambling winnings in his pockets. ¶ No summons was issued for the defective taillight. In fact, no written notation regarding the light was made in either the officer's memo book or his arrest report. Officer Kelly's only recollection of making any report as to the defective taillight to anyone was a report he said he made during conversations with an Assistant District Attorney in the complaint room on the morning after the incident. Although the incident occurred at 5 P.M. on December 10, Kelly, who was the driver of the police vehicle, was uncertain as to whether it was dark enough for automobile lights to have been turned on at the time. Significantly, he did not testify that the lights of his vehicle were on. ¶ It is still the law of the land and of this State that "the citizen who has given no good cause for believing he is engaged in [criminal] activity is entitled to proceed on his way without interference" (*Brinegar v United States,* 338 US 160, 177) from the police. Clearly, an arbitrary stop of an individual automobile, even for a purportedly " 'routine traffic check' ", is impermissible unless the police officer reasonably suspects a violation of the Vehicle and Traffic Law (*People v Ingle,* 36 NY2d 413, 419). And while "[a]n actual violation of the Vehicle and Traffic Law need not be detectable * * * [what] is required is that the stop be not the product of mere whim, caprice, or idle curiosity * * * the stop [must be] based upon 'specific and articulable facts which, taken together with rational inferences from those facts, *reasonably* warrant [the] intrusion' (*Terry v Ohio,* 392 US 1, 21)" (*People v Ingle,* 36 NY2d 413, 420, *supra;* emphasis added). And while issues of credibility are primarily for the trial or hearing court, whose determination is entitled to great weight "reversal is warranted where the fact findings of the trial court are manifestly erroneous or so plainly unjustified by the evidence that the interests of justice necessitate their nullification [citations omitted] [T]estimony which has all the appearances of having been patently tailored to nullify constitutional objections [should not be credited]. In evaluating testimony we should not discard common sense and common knowledge." (*People v Garafolo,* 44 AD2d 86, 88, *supra.*) ¶ It seems quite clear that Officer Kelly's assertion that "the left rear taillight was out" constitutes no more than a pretext justification for what would otherwise have been an impermissible stop of the car in which the defendant was riding. These officers were assigned to the anticrime unit and were not assigned to traffic duty (*People v Flanagan,* 56 AD2d 658, 659). They were on anticrime patrol, riding around in taxicabs "looking for *crimes* in progress on the street." A broken taillight is hardly a *crime* and common sense argues forcefully against any belief that they would disclose their true identity, "blow their cover", by stopping a vehicle because "the left taillight was out." The ineluctable conclusion to be drawn from the attendant circumstances and Officer Kelly's testimony that he "observed a vehicle travelling in a slow rate of speed for about a block and half" is that these anticrime officers had their suspicions aroused by that slow-moving car and decided to stop the car to investigate. The fact that no summons was issued to the driver for the defective taillight, nor was any record made by the officer of the fact of the defective taillight, is of telling

significance, as is the fact that no mention was made of it until the next morning when it was allegedly related to an Assistant District Attorney. ¶ " 'The rule is that testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case.' " (*People v Garafolo, supra,* p 88, citing 22 NY Jur Evidence, § 649.) There was no lawful basis for the stop of the vehicle in which defendant was riding. Thus, without more, there was no authority to require the defendant to exit the car. (See *Pennsylvania v Mimms,* 434 US 106; *People v Harrison,* 57 NY2d 470; *People v Jerome,* 100 AD2d 397 [dissenting opn, Fein, J.].) ¶ The holdings of *Pennsylvania v Mimms* (434 US 106, *supra*), *People v Livigni* (58 NY2d 894, affg 88 AD2d 386) and *People v David L.* (56 NY2d 698, revg 81 AD2d 893) do not require a different result. In each of those cases there had been a *lawful* stop of the vehicle, a circumstance not here present. Moreover, in *People v Livigni,* it was only after the police officer noticed an *empty gun holster* on the front seat between the driver and passenger that guns were drawn and the driver and occupant ordered out of the car. Similarly, in *David L.,* the defendant, who was the passenger, slid across the front seat of the car after the officer opened the door, and as he did so, his sweater "rolled up on him" revealing a weapon in his waistband. Here, the only predicate for Officer Kelly's order to the defendant to get out of the car was the fact that he noticed that the "defendant kept his left arm very stiff and tight to his body", apparently, according to Kelly, even while holding the panes of glass, throwing the "night deposit" type bag onto the floor and then flipping it to Kelly across the front seat and receiving it back from Kelly. In any event, keeping one's arm very stiff and tight to one's body is at best innocuous behavior, which "alone will not generate a founded or reasonable suspicion that a crime is at hand." (*People v De Bour,* 40 NY2d 210, 216; *People v Williams,* 79 AD2d 147.) ¶ The People's evidence is unclear as to how Officer Underwood retrieved the gun from defendant's person. Kelly said Underwood just reached and came up with the gun. Underwood said he grabbed the defendant, but saw no weapon, that he discovered it only when he searched the defendant. Underwood's version is remarkably similar to that related by the defendant who said the officer pulled him from the car, patted him down, but did not find the gun until he searched him. What is clear however, is that none of the officers expressed any fear for his safety, and Kelly only saw an object sticking out, "protruding from under [defendant's] left arm" as he "backed out of the vehicle towards police officer Underwood." Kelly did not know what the "object" was and was only able to describe it as "something". Such an observation is patently insufficient as a reasonable indication of the presence of a revolver. (*People v Williams,* 79 AD2d 147.) Indeed, a pocket bulge can "be caused by any number of innocuous objects" (*People v De Bour,* 40 NY2d 210, 221). So it was, that in considering *People v Bernard* (41 NY2d 759), which is one of the three cases comprising the trilogy and reported under the title *People v Prochilo* (41 NY2d 759), the Court of Appeals suppressed a handgun taken from the defendant by a police officer who, upon tapping the defendant's pocket, felt a hard object which did not have the configuration of a gun and which he could not identify, but nevertheless reached into the pocket and removed. There, as here, there was nothing in the defendant's prior conduct that was "reasonably referable to or indicative of the presence of a revolver." (*People v Prochilo,* 41 NY2d 759, 763, *supra*.) And again in *Bernard,* as in the case at bar, there was nothing in the testimony of the officer to suggest that at any time he was apprehensive for his safety. "Absent other circumstances indicative of or referable to the presence of a handgun, a police officer must

show that the object or appearance thereof which is the focus of his attention resembled a gun" (*People v Williams,* 79 AD2d 147, 152, *supra*). Since "[a] 'bulge' or 'heavy object' is much less definitive than the 'complete outline of a revolver' or 'the configuration of a handgun' observed by the arresting officer in the cases where the Court of Appeals upheld the suppression" (*People v Williams, supra,* p 152), suppression should be granted here, where so far as we know from his testimony, the "frisking" or "searching" officer neither saw nor felt anything prior to reaching into defendant's clothes, and his partner saw only an "object" (not otherwise described) sticking out from "under defendant's left arm". Especially so, where the testimony has all appearances of having been patently tailored to nullify constitutional objections.