OPINION OF THE COURT
Kristin Booth Glen, J.
This case presents the important but unresolved issue of the right of passengers in a cab or livery to challenge, on Fourth Amendment grounds, both a police stop of the vehicle and the subsequent search of the back seat where they were sitting. For the reasons discussed below I hold that passengers who have hired a vehicle have standing to raise the reasonableness of police action in stopping the vehicle and that they have a reasonable expectation of privacy in the floor of the area in which they are seated so as to give them standing to challenge a search and seizure from that area.
In addition, some special note should be taken of the police testimony in this case, since it exemplifies an alarming trend not only in testimony “patently tailored to nullify constitutional objections” (People v Garafolo, 44 AD2d 86, 88), but in an apparently routine police procedure which threatens the constitutionally protected civil liberties of our citizens.
In this case, as in a number of others where hearings were held before this and other courts (e.g., People v Judge, *16 117 Misc 2d 912; People v Riddick, index No. 7661/83),[1] police officers from the Taxi Squad of the Street Crime Unit have testified to stops of “suspicious” liveries or gypsy cabs in the Harlem/Northern Manhattan area. In all these cases, the police are patrolling, allegedly surreptitiously, in otherwise unmarked yellow cabs.[2] Repeatedly they make stops based on their “observation” of glances by passengers in their direction, followed by “suspicious” arm or hand movements of a passenger in the back seat. In another variation, they observe a defective taillight although no notation of the violation is made and no summons issued to the driver. (See, e.g., People v Nelson, 102 AD2d 765, 766 [dissenting mem].) Although they testify that they approach the driver, who either answers that everything is OK (the instant case), or shrugs because he does not speak English (People v Judge, supra; People v Riddick, supra) they inevitably proceed to the passenger area where they either observe additional “suspicious” gestures or see contraband in plain sight. Inevitably a gun or other contraband is discovered.
Crime against cabs and cabdrivers, both medallion and livery, is-a serious problem, and the mission of the Taxi Squad, to detect and prevent such crime is a useful and appropriate one. However, it appears that members of the squad patrolling in minority neighborhoods may use the pretext of possible taxi crime as an excuse for stopping gypsy cabs and searching the passengers with the hope of finding guns or other contraband. The number of such stops and searches which do not result in the seizure of evidence cannot be determined, but the increase in suppression hearings where this pattern is exhibited has risen dramatically, suggesting that such livery stops may, as one Judge has stated, “evolve into an art form to complement its cousin, the ‘dropsy’ case.” (See People v Aguirre, 111 Misc 2d 586, 589.)
*17 Whatever the absolute number or percentage of such unwarranted livery stops and seizures may be, the deprivation of rights they entail cannot be tolerated. When a court is confronted with such a constitutional violation, it should and must suppress the evidence seized to deter such unlawful police conduct as the spirit and purpose of the exclusionary rule require.
FACTS
A hearing was held before me on April 4,1984, at which Police Officer Hugh Agar (Agar) and the defendant Miguel Castro (Castro) were the only witnesses. According to Agar, on November 23, 1983, at approximately 12:30 a.m. he and Police Officer DeWitt, members of the Street Crime Unit, Taxi Squad, were patrolling in a yellow cab, in plain clothes, in the vicinity of 170th Street and Broadway. They were headed northbound on Broadway when they stopped for a traffic light at the intersection of 170th Street. Agar, the driver, overshot the corner and stopped in the middle of the intersection, requiring him to back the car out of the intersection. At this point he noticed a livery, with the two defendants in the rear seat, stopped at the light, westbound on 170th Street". As the light changed, the defendant’s vehicle turned left onto Broadway and proceeded southbound. Agar noticed that the defendants looked in his direction both before the light changed and as their livery was making the turn onto Broadway. The defendant Castro testified that he had been lost in thought and looking out the window when Agar stopped short in the intersection. His attention was drawn to the unmarked police car at that time, but he had been looking in that direction anyway. He continued to look at the yellow cab as the car he was in turned.
Agar immediately made a U-turn and followed the defendants. Once again he saw the defendants look in his direction and then look away. Castro testified that his attention was drawn to the police car again when it made a U-turn right behind his car. Finally he noticed the car again when its horn started to blow. He turned and saw the flashing red light which Agar had placed in the front window. Agar claimed that he then saw the defendant Perez, who was sitting on the right side, “bend slightly *18 forward”. It was at this point that he took steps to stop the defendant’s vehicle. Castro testified that he never saw Perez make this motion.
As they exited the unmarked police car, there is a conflict in testimony as to whether both officers had their guns drawn and were holding flashlights or not. According to Agar, he went to the driver’s window and his partner went to the opposite side of the car, to Perez’s door, while Agar spoke to the driver. After ascertaining from the driver that everything was “OK”, Agar allegedly shone his light through the driver’s window and was able to see a shiny pistol on the back floor near Perez.
Castro’s account of these events was quite different. According to him, Agar did not first speak to the driver, but instead went straight to his door, while DeWitt went to Perez’s door. Both officers then made both defendants get out and searched them. Agar then held them at gunpoint at the rear of the livery, while DeWitt searched the interior of the car for several minutes. The gun was presumably the product of that search. Castro denied being in possession of the weapon or having seen it either in possession of the defendant, Jose Perez, or inside the livery.
I find, based on my assessment of the credibility of the witnesses, and as discussed above, that Agar observed the defendants looking at him, but that the suspicious “bending forward” which he reported either did not occur or was so innocuous as to be entirely inconsistent with criminal activity. (See discussion, infra.) In addition I credit the testimony of defendant Castro that the gun was seized only after he and Perez had been ordered out of the cab and the back seat searched.
THE LAW
STANDING
The People argue that defendants have no standing either to contest the stop of the cab, citing People v Judge (supra), or its search, citing Rakas v Illinois (439 US 128); People v Belton (55 NY2d 49); and People v Judge (supra). If they are correct, the reasonableness of the police action here need not be determined. Accordingly, the issue of standing must first be resolved as to each separate alleged *19 Fourth Amendment violation.[3] This in turn requires a careful reading of Rakas and subsequent cases which have limited standing in analogous situations.
A. The Stop
There is little case law on the issue of whether passengers in livery cabs have standing to challenge the stop of the vehicle in which they were riding,[4] although at least one commentator has suggested that “[w]hile passengers are for the most part foreclosed from challenging searches of automobiles in which they are riding, they are not foreclosed from challenging the stop of the vehicle, since such a stop encompasses a personal seizure which each person in the vehicle has standing to challenge.” (1 Ringel, Searches and Seizures, Arrests and Confessions [2d ed], § 11.7, p 11-32; cf. Kamisar, remarks on Rakas in Choper, Kamisar & Tribe, The Supreme Court: Trends and Developments 1978-79, at pp 160-161.)[5]
Rakas (supra) itself draws a distinction between standing to challenge a stop and a search,[6] and leaves the former question open. It is, therefore, necessary to consider the underlying Fourth Amendment principles which support this distinction in order to resolve the open question.
As Rakas (supra) observes, the Fourth Amendment rights not to be unreasonably searched or seized are personal rights. Restriction of an individual’s freedom to move, to “walk away”, however brief, constitutes a seizure of that person which must be measured against constitutional standards (e.g., People v De Bour, 40 NY2d 210). It is the interference with an individual’s movement, even a temporary detention, which is protected against.
*20 People choose to move from one place to another in various ways — by foot, by bicycle, by rollerskates, by private car, or by medallion or livery cab. Whatever the means, the movement is intentional, the product of the individual’s choice and direction, and the choice itself is a manifestation of the individual’s self-determination. As long as the movement is the direct result of such choice, it may not be impeded by the State without some showing of necessity.
A person who hires a cab or similar vehicle and directs it to a particular destination is exercising that choice and that freedom of individual movement which is protected by the Fourth Amendment. It is not the ownership of the vehicle, but the choice of where it shall go which is, of necessity protected. By stopping a hired vehicle, the police have interfered with its passenger’s movement as surely as if s/he had been strolling on the sidewalk or driving his/her own car.[7] Constitutional protection of the freedom of individual movement cannot turn on the means of that movement, and, more particularly, should not and cannot turn on whether the moving individual hires or owns that means, car, bicycle, rollerskates or whatever.
A recent decision of the First Department appears to have adopted this rationale sub silentio. In People v Davis (99 AD2d 1026), the court considered the constitutionality of a police stop of a moped on which the defendant was a passenger without discussion of the defendant’s standing. And in People v Nelson (102 AD2d 765, supra), although the trial court and Appellate Division again upheld a stop on the particular facts of the case, there was no intimation that the defendant, a passenger in the car, lacked standing to challenge that stop. Accordingly, I hold that a person who hires a cab to take her/him to a destination of her/his choice has been personally “stopped” and “seized” when the cab is stopped, and so has standing to challenge the police action in making that stop.
B. The Search
Beginning with Katz v United States (389 US 347), the Supreme Court has defined the Fourth Amendment right *21 to be free from an unreasonable search in terms of the individual’s “expectation of privacy” in the area searched. More recent cases restricting standing have adhered to the standard of “expectation of privacy”, applying it to various factual settings with a variety of results. Rakas (supra) itself refers to Katz as continuing to provide “guidance in defining the scope of the interest protected by the Fourth Amendment” (Rakas v Illinois, supra, at p 143).
Although Rakas (supra) involves an automobile, it does not, by any means, suggest that any otherwise protected expectation of privacy disappears when an individual enters a car. Instead, that decision involves a factual determination as to the specific expectations of specific individuals. In Rakas mere passengers of an automobile were found to have no legitimate expectation of privacy in the glove compartment, trunk, or area under a seat other than where they were sitting[7] as such areas would normally be of no concern to them, but rather to the owner of the car[8]
The expectation of privacy is not tied to strict property concepts, rather, it is the legitimate ability to exercise dominion and control (see, e.g., Jones v United States, 362 US 257, 267, overruled on other grounds United States v Salvucci, 448 US 83), or the right to exclude others which controls. (E.g., United States v Burnett, 493 F Supp 948 [NDNY], affd sub nom. United States v Cook, 652 F2d 55 [CA2d], cert den 452 US 964.)
The test suggested by Rakas (439 US 128, 144 supra), and followed by the courts of this State is two pronged: whether a defendant has an actual subjective expectation of privacy, and whether that expectation is objectively reasonable, that is, one which society recognizes as reasonable (e.g., People v Lerhinan, 90 AD2d 74, 75-76). It is as to the second, or objective portion of the test that property concepts may be invoked. As the Rakas court wrote “Legitimation of expectations of privacy by law must have a *22 source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.” (439 US 128, 144, n 12, supra.)
Not surprisingly the post-Rakas decisions of New York courts have reflected this notion of the “legitimacy” of privacy interests as connected to principles of property law. Thus a hotel guest’s right to privacy in his room was lost when the rental period expired and no further rent was paid, based on the special body of law which governs the guest/hotel keeper relationship.[9] On the other hand, a motel guest whose rent has been timely paid retains his protected right to privacy in that room (e.g., People v Brown, 95 AD2d 569).
A person who has lawfully borrowed a car (e.g., People v Robinson, 121 Misc 2d 267, 269) or who is driving it with the consent of a relative who is the owner (e.g., People v Zimmerman, 117 Misc 2d 121, 124 [father driving daughter’s car]; People v Regnet, 111 Misc 2d 105, 106 [husband driving wife’s car]) expects, and “legitimately” expects, privacy within that car, while one who steals a car will not have his/her expectation, however strongly held, recognized as legitimate by society as a whole (see People v Traynham, 85 AD2d 748, 749). These same concepts can be applied to passengers in limousines, cabs or other hired vehicles.
Many persons do not or cannot afford to own their own cars, and choose not, or are not able to borrow cars from others. Instead, they hire medallion cabs, liveries or “gypsy” cabs to take them to their destinations. While a passenger in such a vehicle is not the “owner”, s/he rented it for her/his exclusive use during the trip. The public at *23 large knows and understands that a cab with a passenger is not available to it until the passenger alights from the cab — of whatever sort. A cabdriver who has accepted a fare must, by law, take her/him to his/her destination and may not pick up (permit to enter) additional passengers, while the passenger her/himself may request that others be picked up or discharged, or excluded altogether.[10]
The Supreme Court itself has recognized the status of passengers in a cab as one reflecting a “legitimate” expectation of privacy, entitling the passenger to standing to raise a Fourth Amendment claim.
In Rios v United States (364 US 253), a pre-Rakas case, a passenger successfully suppressed evidence seized from the floor of the back seat where he was sitting. Rios in turn is cited in Katz, where the court wrote “No less than an individual in a business office, in a friend’s apartment, or in a taxicab, a person in a telephone booth may rely upon the protection of the Fourth Amendment” (389 US 347, 352, supra). Katz, of course, provides the framework for the majority’s decision in Rakas (supra).
The Rakas dissent took note of the Rios situation in criticizing the majority’s denial of standing to passengers who are guests in a private car (439 US 128, 163, 167, supra). [11] The majority “responded” in a footnote which reaffirms Rios and appears to support, rather than deny,[12] standing to a taxi passenger. The court wrote: “The dissent states that Katz v. United States, expressly recognized protection for passengers of .taxicabs and asks why that protection should not also extend to these petitioners. Katz *24 relies on Rios v. United States, 364 U.S. 253 (1960), as support for that proposition. The Question of Rios’ right to contest the search was not presented to or addressed by the Court and the property seized appears to have belonged to Rios. See United States v. Jeffers, 342 U.S. 48 (1951). Additionally, the facts of that case are quite different from those of the present case. Rios had hired the cab and occupied the rear passenger section. When police stopped the car, he placed a package he had been holding on the floor of the rear section. The police saw the package and seized it after defendant was removed from the cab” (439 US 128, 149, n 16, supra; emphasis added).
The defendants in this case hired a livery cab at 181st Street and St. Nicholas Avenue for the purpose of taking them to defendant Castro’s home at 143rd Street and Broadway. They were the only passengers in the cab. Castro testified that he expected privacy in the cab, and for all the reasons discussed above, I find that such expectation, at least as to the area in the back seat where they were seated, was legitimate. Accordingly, I hold that both defendants have standing to challenge the search of the cab which resulted in seizure of the gun with whose possession both are charged.
C. Legality of the Stop and Search
The leading New York case on car stops is People v Ingle (36 NY2d 413), where the Court of Appeals held that a particular car may not be singled out and stopped unless the stop is conducted pursuant to nonarbitrary, nondiscriminatory highway procedures, or when there is specific cause, or at least reasonable suspicion that criminal activity is afoot. Ingle was followed in People v Sobotker (43 NY2d 559), a case quite similar on its facts to this one.[13] The lack of objective evidence of criminal activity was dispositive in finding impermissible a stop based on a hunch, or knowledge that there was no “more than subjective” (supra, p 564).
*25 The court wrote, in language equally applicable to the instant case: “Subsequent events did indeed demonstrate that the officers’ hunch may well have been correct. But a search may not be justified by its avails alone. Constitutionally protected rights are not to be dispensed with in this case solely because the results of the improper search and seizure uncovered the fact that one or all of the persons who were its targets were armed with a deadly weapon. Almost any series of indiscriminate seizures is bound to produce some instances of criminality that might otherwise have gone undetected or unprevented. But were hindsight alone to furnish the governing criteria, a vital constitutional safeguard of our personal security would soon be gone” (43 NY2d 559, 565, supra).
In the instant case, given the facts which I have found from the conflicting testimony, the police had no more than a hunch, based on the defendants twice glancing at them while they rode in a livery in a high crime area. The defendants’ actions were at least equally consistent with innocent as with guilty behavior (see, e.g., People v Russell, 34 NY2d 261, 264); as such they do not rise to that level of “reasonable suspicion” necessary to justify the stop here (People v Sobotker, supra; see People v De Bour, 40 NY2d 210, supra). Since the search followed and resulted from the stop, evidence seized must be suppressed.
The People’s reliance on Texas v Brown (460 US 730)[14] is thus misplaced. Even assuming that the weapon was in plain view, the officer must have the right to be where he is (see, e.g., Harris v United States, 390 US 234, 236). If, as here, the stop which brought the police’s view to the back seat of the cab was impermissible, anything seen and seized thereafter was clearly the “fruit of the poisonous tree” of the illegal stop, and thus inadmissible. (See, e.g., People v Ingle, supra; People v Allende, 39 NY2d 474.)
For all the above reasons, the motion to suppress the gun seized from the livery cab in which defendants were riding is granted.

. Interestingly, the same police officer testified in both Judge and Riddick; the almost total similarity of his testimony as to suspicious glances and arm motions was a factor in finding his testimony in the second case “patently tailored” and suppressing the gun found there.

. It is a matter of common knowledge that medallion cabs seldom enter the neighborhoods in which these stops are invariably made, so the presence of two plainclothes police officers in the front seat of such cabs can hardly camouflage their true identity and purpose.

. The distinction between “standing” and substantive Fourth Amendment violation has been blurred, if not erased by the Rakas decision (439 US 128, 139; see People v Lerhinan, 90 AD2d 74, 75, n 1) but the issues will be discussed here as standing, since that is how the argument has been cast by the parties.

. Judge Fertig of District Court, Nassau County, has held that they do (People v Green, 121 Misc 2d 522, 526-527) while Justice Hornblass of this court has held to the contrary (People v Judge, 117 Misc 2d 912).

. He wrote, “|T|he passenger in a cab shares with the driver a privacy interest in continuing his travels. If the search of the vehicle is a product of the prior illegal stopping, then the passenger should be able to challenge the search because it was brought about as a consequence or fruit of the prior invasion of his personal liberty” (emphasis added).

. Justice Powell wrote in a concurring opinion: “The petitioners do not challenge the constitutionality of the police action in stopping the automobile in which they were riding” (439 US 128, 150-151, supra).

. It is significant to note that standing has never been an issue where a private car is stopped. (See, e.g., United States v Brignoni-Ponce, 422 US 873; People v Sobotker, 43 NY2d 559; People v Ingle, 36 NY2d 413.)

. It is not, of course, the fact of ownership or legal title which creates the expectation of privacy, but dominion and control of those areas and the legitimacy of such control (Rakas v Illinois, 439 US 128, 142-143, citing, e.g., Jones v United States, 362 US 257; Rakas, at pp 152-153 [concurring opn of Powell, J., and Burger, Ch. J.]). Conversely, of course, the “owner” or bailee of a car may have no legitimate expectation of privacy in something which his passenger is carrying within the car. (E.g., State v Jordan, 40 NC App 412 [passenger’s pocketbook]; United States v McGrath, 613 F2d 361 [CA2d], cert den sub nom. Buckle v United States, 446 US 967 [passenger’s briefcase].)

. Generally speaking, where a hotel guest has been in residence less than 30 days, there is no conventional landlord-tenant relationship and an owner may displace an occupant without resort to the use of summary proceedings. Under section 181 of the Lien Law, the owner may seize the property of a defaulting guest and sell it at auction. (People v Lerhinan, 90 AD2d 74, 77.)

. See, e.g., Taxi & Limousine Commission rule 209: “A driver shall not pick up additional passengers except if the passenger who hired the taxicab requests that the driver do so.” While this rule does not technically include liveries, which are generally outside the Commission’s jurisdiction, the societal and passenger expectations are the same as for medallion cabs. Unfortunately, liveries are frequently the only form of private transportation-for-hire in minority neighborhoods (n 2, supra) and individuals hiring cabs should not be deemed to have a greater or lesser expectation of privacy based on the availability of medallion cabs where they are located.

. Justice White wrote, “What about a passenger in a taxicab? Katz expressly recognized protection for such passengers. Why should Fourth Amendment rights be present when one pays a cabdriver for a ride but be absent when one is given a ride by a friend?” (439 US 128, 167.)

. The opinion in People v Judge (117 Misc 2d 912) cites only a portion of a footnote in Rakas (439 US 128) to deny standing to taxi passengers. The omission of the latter portion, here emphasized in the text, completely changes the meaning of the footnote as a whole.

. In that case two police officers observed a car driving slowly toward an intersection. The car paused for a second or two in front of a bar called J.T.’s and the occupants of the car turned their heads toward.the bar. The car continued on and eventually stopped at a stop sign where the defendants glanced in the direction of a second bar. At this point the police turned on their siren and pulled the car over to the curb. The Court of Appeals suppressed a gun found in the car because the initial stop was not based on objective “reasonable suspicion” that a crime had been, was being, or was about to be committed.

. At the conclusion of the hearing, the Assistant District Attorney cited that case for the proposition that it is permissible for a police officer to shine a flashlight into a car when dealing with its occupants after it has been stopped.