OPINION OF THE COURT
William J. Deeley, Jr., J.
The defendant is charged with possession of a loaded weapon and other weapons and with possession of three different controlled substances and drug paraphernalia.
Pursuant to defendant’s motion to suppress the weapons and other contraband, a hearing was held before this court on October 25 and 26, 1984. After the hearing both attorneys requested time to submit written memoranda of law which have now been received by the court. The hearing consisted of the testimony of two police witnesses appearing for the People: Police Officer Harold Kukk and Lieutenant Thomas Cafferty. Both witnesses testified that they were members of the Taxicab Robbery Squad which, according to Lieutenant Cafferty’s testimony, is a small unit of the New York City Police Department formed in 1981 in an attempt to lessen the number of robberies of both medallion cabs and livery vehicles, the latter being more commonly known as gypsy cabs. Taking into account the testimony of both Police Officer Kukk and Lieutenant Cafferty, the following factual picture may be drawn:
*483 On July 30, 1984, Lieutenant Cafferty and his driver, Police Officer Kukk, were in civilian clothes and were parked in an unmarked vehicle on Nostrand Avenue at its intersection with Atlantic Avenue. Their vehicle occupied the crosswalk on Nostrand Avenue and the front of the vehicle may have extended slightly into the nearest lane of Atlantic Avenue. From this position, according to their testimony, they were observing the passing traffic on both avenues. At approximately 11:30 p.m. they noticed a gypsy cab stopped for the traffic signal at that intersection and situated to their left. When the light changed and the gypsy cab proceeded from left to right, passing within a few feet of the unmarked police vehicle, they noticed that the sole passenger, a black male, continually gazed in their direction. When that vehicle had cleared the intersection, Lieutenant Cafferty ordered Officer Kukk to make a right turn and surveil the gypsy cab. Kukk made a right turn and was directly behind the gypsy cab following it for some 6 to 8 blocks. During this surveillance the passenger of the gypsy cab, and the defendant in this matter, Alexander Moore, turned around to look at the two officers on, according to Officer Kukk’s testimony, 3 or 4 occasions. The cab was then stopped by means of the horn and siren of the police vehicle and the use of a high-powered flashlight which Lieutenant Cafferty flashed on and off in the direction of the cab. The cab stopped; Officer Kukk approached the left-hand rear passenger door and Lieutenant Cafferty approached the right-hand rear passenger door. There were ensuing developments which revealed that Alexander Moore was in possession of a loaded firearm, other weapons and other contraband. Further activities of both the police and defendant need not be discussed at this point since we must first decide whether this was a permissible or nonpermissible stop.
The court has reviewed two prior cases .involving members of the same Taxicab Robbery Unit and having almost identical fact patterns, those being: People v Judge (117 Misc 2d 912), and People v Castro (125 Misc 2d 15).
In the J udge case (supra) suppression was denied, while in the Castro case (supra) suppression was granted. In both these cases and in both memoranda submitted by the attorneys in this matter, the bulk of the arguments have to do with the law regarding stopping an automobile and the standing of a passenger in a vehicle for hire to bring on a motion such as this. I feel I must depart from the rationale used in J udge and Castro and in the memoranda. It is abundantly clear and I think conceded by the People that these officers had no objective reason to stop this vehicle and by that I mean there was no obvious legal defect in *484 the vehicle, nor did they have any objective reason to stop the driver of the vehicle inasmuch as there was no testimony that the driver committed any moving violation. What the officers did stop was a person, the defendant, who was coincidentally a passenger in a gypsy cab.
The reasons for my departure from prior opinions will, I think, become clear when I discuss the apparent modus operandi of the New York City Police Department’s Taxi Squad. At this point, however, I do make the finding that the law regarding automobile stops and the law regarding the standing of an automobile passenger and the case law incident to both are merely accidental characteristics to the real issue in this matter, which is the stopping of a person the police intended to stop, an issue I find akin to the police-citizen street encounter (CPL 140.50, subd 1).
From a review of the facts in Judge and Castro (supra) and also the facts in this case and the testimony in this case, mainly of Lieutenant Cafferty, it has become clear to me that one of the main stratagems of the Taxi Squad is as follows: the officers in plain clothes and in unmarked cars place themselves in a very visible position in a black or Hispanic area. Since they are both Caucasian and since the vehicle, although unmarked, is of police issue they leave very little doubt as to who they are. They then surveil the passing traffic waiting for the passage of either a medallion or a gypsy cab. If such a vehicle comes into their view and contains a passenger or passengers they deem likely to be a potential robber of that cab, and at the same time the passenger or passengers take note of the officers, they then follow the cab. If in their surveillance of the cab the passenger or passengers within that vehicle also continually surveil their pursuer they make the assumption that down the road, and this term is used in both its literal and figurative sense, this passenger or passengers intend to commit a crime and they stop the passenger or passengers by stopping the subject vehicle.
In referring to the defendant in this case and to his turning around to look at the officers 3 or 4 times during the surveillance, the People argue in their memorandum as follows: “This behavior raised the suspicion in both officers’ minds that the defendant had recognized them to be police officers, and that the defendant was concerned about their presence because he intended a robbery or other crime involving the cab driver.” They therefore use as a basis for stopping the cab, the intention of the passenger to commit a crime. In my mind this defies logic. A police officer who makes the assumption that a passenger has recognized him to be such and is concerned about his presence *485 must at the same time make the further assumption that the passenger’s intention to commit any crime has completely evaporated upon his recognition of his pursuer. Therefore at the exact same moment of recognition the police officers gain and lose their stated reason for stopping the passenger in the subject vehicle. There is no assertion in this case that the defendant had committed a crime, or was committing a crime. The assertion in this case is a crime in posse, not a crime in esse, and certainly, as noted above, a crime in posse is voided by the recognition of the police pursuer.
To confirm that the stratagem outlined above is at least a portion of the modus operandi of the Taxicab Robbery Squads I offer the following colloquy between the court and Lieutenant Cafferty, who testified that he is the supervisor of four Taxicab Robbery Squads.
“Court: As a member of the Taxi Robbery Squad, how many times have you stopped a cab or a livery vehicle based solely on the movements or activities of the passengers?
“Witness: Hundreds.
“Court: Hundreds of times?
“Witness: Yes.
“Court: Is that a common practice based solely on the activities of the people in the back seat, the passengers?
“Witness: Yes, sir.”
Based on the court’s knowledge of what occurred in the Judge case (supra), the Castro case (supra), and in this case, it is this court’s assumption that after the stop if the defendant possesses or the rear passenger area of the cab contains a weapon, it is in some manner always found. One may therefore surmise that of the hundreds of inquisitive passengers stopped while riding in cabs or livery vehicles those found to be in possession of a weapon or other contraband are arrested, and those found not in possession of such articles are allowed to continue on their way. Rather than pursuing these thoughts I would adopt the language of Justice Glen in her decision of People v Castro (supra), that being the second half of page 16 to and including the first seven lines on page 17.
Both section 12 of article I of the New York State Constitution and the Fourth Amendment to the United States Constitution provide that “[t]he right of the people to be secure in their persons * * * shall not be violated”. *486 On the other hand it is clear that a police officer has the right to stop a person; this right is based both upon the common law (People v Eaddy, 60 AD2d 763), and upon statute (CPL 140.50).
Generally it may be said of the instant situation that Alexander Moore as a passenger in the cab had every right to be secure in his continued and uninterrupted motion unless the police had a valid reason to interfere with that motion and to stop the person of the defendant. As I stated at the outset I am regarding this situation as a stop of a person rather than a stop of an automobile. The fact that Mr. Moore was at the time a passenger in a taxicab rather than a person facing an ordinary police-citizen street encounter is of no moment. There is no rule that a person in a cab becomes insulated from a reasonable stop by the police or that the police are held to a higher standard than reasonableness to justify the stop. (People v Hutchinson, 60 AD2d 577, affd 47 NY2d 823.)
o Viewing this as a street encounter we must determine whether we are dealing with a street inquiry, a stop, or a seizure, and then, whether the quantum of knowledge possessed by the officers was sufficient to justify their activity.
A street inquiry is a minimal intrusion of approaching to request information when there is some objective credible reason for that interference. (People v De Bour, 40 NY2d 210.)
A stop is an exercise of the common-law right to inquire and is activated by a founded suspicion that criminal activity is afoot. (People v De Bour, supra.)
A seizure is the physical or constructive detention of a person by virtue of a significant interruption of his liberty of movement (People v Cantor, 36 NY2d 106) and must be founded on, for the purposes of this case, a reasonable suspicion that the person seized is about to commit a crime (CPL 140.50).
In Cantor (supra, p 109) the defendant, on the sidewalk, had his car blocked by an unmarked police vehicle and saw “three men in street clothes approaching him from different directions.” The Court of Appeals held that to be a seizure.
In the present case, the defendant, who has no power over his own locomotion, finds himself stopped with a car door and a plain-clothes policeman to his left and a car door and a plainclothes policeman to his right. I don’t see any significant difference between the two encounters and I therefore find that the defendant Moore was effectively seized.
But the People assert that the officers, by observing the defendant’s glances toward them and his continued interest in *487 them gained a reasonable suspicion that the defendant intended to rob the cab and that a seizure is therefore justified. That doesn’t wash. Reasonable suspicion has been defined as denoting the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand. (People v Finlayson, 76 AD2d 670.)
Whether we term the defendant’s activity within the cab innocent, innocuous or at least equally consistent with innocence as with guilt (People v Castro, 125 Misc 2d 15, supra) we do not find that this activity would allow anyone to vault to the conclusion that a specified crime was at hand.
It is my opinion that the stop here is not only constitutionally impermissible, but largely manufactured by the authorities. The police were parked in a highly visible area to lure the attention of passing gypsy cab passengers of predetermined types. They then overtly followed directly behind the cab in an attempt to continually lure the attention of such passenger so that they might use such attention as the basis for stopping the passenger, and they then come into court and claim the passenger has no right to question this activity because he has no standing as a passenger to move to suppress. And they are apparently doing this day in and day out. It must stop. The alternative is to have each case brought on these or similar facts fail to pass constitutional muster.
The Taxi Robbery Squad is a useful tool in the New York City Police Department. The court is aware, of the statistics and the fact that taxicab robberies have diminished since this unit was formed. This type of crime has lessened and may in some cases have been prevented by the activity of this unit. However, as the Court of Appeals stated in De Bour (supra, p 220) “One aspect of law enforcement warrants particular mention and that is the area of crime prevention. Since this function is highly susceptible to subconstitutional abuses it will be subject to the greatest scrutiny; for whereas a policeman’s badge may well be a symbol of the community’s trust, it should never be considered a license to oppress.”
The defendant’s motion to suppress is granted.