THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HECTOR MILLAN, Appellant.

First Department, June 26, 1986

### APPEARANCES OF COUNSEL

*John T. McClintock* of counsel *(Gould & Reimer,* attorneys), for appellant.

*Eleanor J. Ostrow* of counsel *(Norman Barclay* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

### OPINION OF THE COURT

SULLIVAN, J.

Defendant appeals from his conviction of criminal possession of a weapon in the third degree. The following account of the incident is derived from the trial evidence.

Sometime before 11:15 P.M., on the night of June 15, 1985, Police Officers Gilligan, a 19-year veteran of the New York City Police Department, and Bowen, an 11-year veteran, assigned to a Taxi Robbery Squad, were on patrol in plain clothes in a medallion taxicab. While the officers were stopped facing north on Lenox Avenue near 112th Street, they observed a gypsy taxicab, which was proceeding easterly at a fast rate of speed on 112th Street, pass a red light at the intersection. Since the officers knew from experience that taxicab operators sometimes pass lights or drive at an excessive speed as a distress signal, they decided to follow.

The officers caught up with the taxicab at the intersection of 111th Street and Fifth Avenue, and pulled alongside the passenger side. Unable to get the driver's attention, Officer Gilligan displayed his shield and told the passenger closest to him, Anthony Veggacada, that he wanted the driver to pull over. The driver was so notified and quickly complied.

Both officers exited their vehicle and approached the taxicab, Gilligan from the driver's side and Bowen, possibly with gun in hand, from the passenger side. As they did so, they noticed that the taxicab's three male passengers were moving from side to side in the rear seat and turning around to look at them. The driver, Dean St. Clare, overheard one of the passengers say "You don't do things like that, be cool." St. Clare had picked up the three passengers, defendant, Veggacada and Hector Colon, at Seventh Avenue and 112th Street.

They had asked to be driven to Lexington Avenue and 112th Street. Defendant sat behind St. Clare. Veggacada sat on the passenger's side and Colon in the middle.

After speaking with St. Clare, Officer Gilligan opened the rear door and told the three passengers to exit one at a time. As each got out, he was frisked by Gilligan, who then directed him to step to the rear of the taxicab, where Officer Bowen was standing. After he had patted down the third man, Gilligan looked into the passenger compartment and observed a brown zippered bag lying on the seat on the driver's side, where defendant and Colon had been sitting. Gilligan asked whose bag it was, but none of the three men responded. The bag did not belong to St. Clare, who, as was his practice, had checked the rear seat of the taxicab after the two passengers immediately preceding defendant and his friends had exited the car. At that time, he had not seen anything lying on the rear seat. As Gilligan took the bag, he felt the weight of a weapon inside and warned his partner that he had discovered a gun. The bag was opened and a gun, later identified as a loaded and operable 9mm. semiautomatic pistol, recovered. All three passengers were charged with its possession.[1]

Defendant and Colon, each a felon, both testified. Defendant variously recalled that when the officers approached the taxicab, after it had been stopped, he either was nervous, began to fidget and tried to look at Police Officer Bowen, or only turned around once to look at the officer, and otherwise sat motionless with his friends. Colon recalled that all three men turned around to look at the officers as they approached. They both testified that subsequent to the frisk, and about 1½ minutes after entering the rear compartment, Gilligan came partially out of the taxicab and said something to his partner. He then ordered defendant and his friends to get on their knees. They were thereafter ordered into the unmarked police car, and asked about the zippered bag. They both denied any knowledge as to its ownership. Neither defendant nor Colon had ever seen the bag until Officer Gilligan showed it to them after they had been arrested. Neither knew anything about the gun.

Although the dissent does not urge the point, defendant argues that the presumption of possession applicable to the occupants of an automobile (see, Penal Law § 265.15 [3]) should

1. After a joint trial Colon was found guilty with defendant, as charged. Veggacada was acquitted.

not have been charged. Since we find that "there is a 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former." *(Ulster County Ct. v Allen,* 442 US 140, 165, citing *Tot v United States,* 319 US 463, 467; *Leary v United States,* 395 US 6, 36), the presumption was properly charged and defendant's guilt proven thereunder beyond a reasonable doubt.

Defendant also argues that the gun which he was convicted of possessing should have been suppressed or, alternatively, that he should have been granted a hearing on his suppression motion. Claiming only that he and his codefendants had been passengers in a taxicab which was stopped by police officers "despite the fact that they had no reason to believe that any of the occupants of the vehicle had committed a crime or were committing a crime at the time of the arrest", defendant, as part of a pretrial omnibus application, had moved to suppress any property taken from his person or possession. Defendant alleged that the police ordered him and the two other passengers to leave the cab, searched them, and without a warrant or their consent, "allegedly recovered a gun from the rear passenger area of the cab". The People opposed the motion on the ground that defendant lacked standing to contest the search.

In its decision denying the motion without a hearing, the suppression court (Berkman, J.), noted the police officers' claim that the three passengers had made "suspicious moves" as the officers approached the taxicab, that as a result the officers had ordered them out of the taxicab, and that the officers thereupon recovered a gun which had been secreted in a zippered bag found in the rear seat. The court further noted that none of the occupants had asserted ownership of the bag or claimed that he had abandoned it as a result of unlawful police action. The court concluded that since the gun was found in a bag none of the passengers claimed to own, their 4th Amendment rights would not be violated by its admission in evidence, even if the initial stop of the taxicab had been illegal.

Suppression of the gun was properly denied. The rights protected by the 4th Amendment are personal rights which "may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *(Simmons v United States,* 390 US 377, 389.)* "[L]ike some other constitutional rights, [they] may not

be vicariously asserted." *(Alderman v United States,* 394 US 165, 174.) Thus, it has been held, "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *(Rakas v Illinois,* 439 US 128, 134, citing *Alderman v United States,* 394 US, at p 174.) Since the 4th Amendment protects people, not places, the right to claim its protection turns upon whether the person seeking it has a legitimate expectation of privacy in the area searched. *(Katz v United States,* 389 US 347, 353.)

In *Rakas (supra),* two passengers in an automobile challenged the seizure of a box of rifle shells from the glove compartment, which had been locked, and a sawed-off rifle from under the front passenger seat. The Supreme Court held that since the petitioners asserted neither a proprietary or possessory interest in the automobile searched, nor an interest in the property seized, and, as mere passengers in the automobile, had failed to show that they had any legitimate expectation of privacy in the searched areas, they were not entitled to challenge the search. In rejecting their claim to a legitimate expectation of privacy in the glove compartment or area under the seat, the court held, "Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy" *(supra,* at pp 148-149; *see also, People v David L.,* 56 NY2d 698, *revg* 81 AD2d 893, on dissenting opn at 895-896 [the defendant, a passenger in car legally stopped, could not object to the opening of the car door since he did not have any possessory interest in the car]; *People v Hunter,* 55 NY2d 930, 931 [the defendant, a passenger in a car, lacked standing to challenge seizure of a weapon observed on the floor in plain view and failed to demonstrate a reasonable expectation of privacy in the area searched]).

Thus, a police officer's intrusion into a particular area, be it an automobile or elsewhere, does not violate the 4th Amendment "unless the area is one in which there is a 'constitutionally protected reasonable expectation of privacy' ". *(New York v Class,* 475 US —, —, 106 S Ct 960, 965, citing *Katz v United States,* 389 US, at p 360 [Harlan, J., concurring].) It has been repeatedly held that the expectation of privacy in "an automobile * * * [is] significantly different from the traditional expectation of privacy and freedom in one's residence." *(United States v Martinez-Fuerte,* 428 US 543, 561; *United States v Chadwick,*

433 US 1, 12; *Preston v United States*, 376 US 364, 366-367; *Chambers v Maroney*, 399 US 42; *see also, South Dakota v Opperman*, 428 US 364, 367.) As the Supreme Court has noted: "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where both its occupants and its contents are in plain view." *(Cardwell v Lewis*, 417 US 583, 590.)

It should be noted that defendant has never claimed any interest whatsoever in the gun or in the zippered bag in which it was found. Thus, defendant, a mere passenger in the taxicab, must, in order to invoke the 4th Amendment's protection with respect to the seizure of the bag and consequent discovery of the gun, show a legitimate expectation of privacy in the passenger seat of the taxicab, the area from which the bag was seized. In this regard, he rests his claim solely on his status as a passenger in a livery taxicab, thus distinguishing his situation from that of the petitioners in *Rakas (supra)*, who were passengers in a private car. Having hired the vehicle, defendant asserts, he had the right to exclude other passengers from occupying it.[2] Inherent in the exclusive right to occupancy, he argues, is a legitimate expectation of privacy in the taxicab.

It is, of course, axiomatic that the right to exclude, an incident of both ownership and the lawful possession of property, normally imputes to such owner or possessor a legitimate expectation of privacy. *(Rakas v Illinois*, 439 US, at p 144, n 12.) As the court noted in *Rakas*, "[B]y focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, [we have] not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment" *(supra*, p 144, n 12). In measuring the scope of that interest, however, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control" *(supra*, at p 143; *Jones v United States*, 362 US 257, 266; *see, Mancusi v DeForte*, 392 US 364; *Warden v Hayden*, 387 US 294; *Silverman v United States*, 365 US 505). Also, while a legitimate presence on premises is not irrelevant to

---

**2.** See, Rules Governing Limousine Drivers, Owners and Base Operators, New York City Taxi and Limousine Commission, rule 29, Rules Governing Drivers of Limousines.

one's expectation of privacy, it is not controlling since it "creates too broad a gauge for measurement of Fourth Amendment rights." *(Rakas v Illinois,* 439 US, at p 142.) Thus, proper analysis requires an examination of all of the factors tending to reflect a privacy interest and which society would be prepared to recognize as reasonable. *(Katz v United States,* 389 US, at p 361 [Harlan, J., concurring].)

Measured against these principles, defendant's claim of a legitimate expectation of privacy in the rear compartment of the taxicab must fail. A passenger in a taxicab cannot rationally expect privacy in an area which, by necessity, he must share with a stranger, the driver.[3] Indeed, not only is a taxicab driver not under any obligation to keep the activities of his passengers confidential, but in certain circumstances he has an affirmative duty to report these activities to the police.[4]

Defendant contends, however, that even if he lacks standing to contest the search of the taxicab on the basis of a privacy interest, he nevertheless may challenge it on the ground that it followed a stop which he does have standing to contest. In this regard, certain commentators have opined that "[i]f either the stopping of the car or the passenger's removal from it are unreasonable in a Fourth Amendment sense, then surely the passenger has standing to object to those constitutional violations and to have suppressed any evidence found in the car which is their fruit." (1 LaFave and Israel, Criminal Procedure § 9.1, at 726.) This argument seizes upon a comment in the concurring opinion of Justice Powell in *Rakas* (439 US, at pp 150-151), that "[t]he petitioners do not challenge the constitutionality of the police action in stopping the automobile in

3. Defendant contends that a footnote in the majority opinion in *Rakas v Illinois* (439 US 128, 149, n 16) lends support to his claim that a taxicab passenger has greater standing to object to a search of the taxicab than the passengers in *Rakas* had to contest the search of a private car. The footnote distinguished *Rios v United States* (364 US 253) in which a taxicab passenger successfully moved to suppress evidence seized during a search of the taxicab. The footnote is of no help to defendant, however, since, as it pointed out, the "question of Rios' right to contest the search was not presented to or addressed by the Court" (439 US, at p 149, n 16). Moreover, *Rios* is distinguishable from *Rakas* since in *Rios* "the property seized appears to have belonged to [the defendant]." When the police officers stopped the taxicab, Rios placed a package he had been holding on the floor. The officers saw the package and seized it (439 US, at p 149, n 16).

4. Rules Governing Drivers of Public Taxicabs and Public Coaches, rule 14, and Rules Governing Drivers of Limousines, rule 13, provide, "A driver * * * shall report immediately to the police any attempt to use his vehicle to commit a crime or escape from the scene of a crime."

which they were riding; nor do they complain of being made to get out of the vehicle." Justice Powell saw the question before the court as a narrow one: "Did the search of their friend's automobile after they had left it violate any Fourth Amendment right of the petitioners?" *(Supra,* at p 151.) While this point of view has received limited judicial recognition *(see, e.g., People v Smith,* 106 AD2d 525; *see also, People v Castro,* 125 Misc 2d 15; *People v Jones,* 125 Misc 2d 91), we cannot find that it measurably advances defendant's position, given the facts of this case.[5]

It is, of course, a well-established principle of constitutional law that "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *(Delaware v Prouse,* 440 US 648, 662.) The stop of an automobile and detention of its occupants constitutes a "seizure" within the meaning of the 4th and 14th Amendments, even though the purpose of the stop is limited and the detention brief *(supra,* at p 653; *United States v Martinez-Fuerte,* 428 US, at pp 556-558; *United States v Brignoni-Ponce,* 422 US 873, 878; *cf. Terry v Ohio,* 392 US 1, 16; *People v John BB.,* 56 NY2d 482, 487; *People v Sobotker,* 43 NY2d 559; *People v Ingle,* 36 NY2d 413). Any assessment of the reasonableness of such a seizure "requires a balancing of the State's interest in the inquiry at issue against the individual's interest in being free from [arbitrary] governmental interference". *(People v John BB.,* 56 NY2d, at p 487; *United States v Brignoni-Ponce,* 422 US 873, *supra.)* Thus, the stop of an automobile on the public highway "is justified only when conducted pursuant to 'nonarbitrary, nondiscriminatory, uniform' highway traffic procedures, or when there is specific cause or, at least, *reasonable* suspicion that a motorist is about to violate a law." *(People v Sobotker,* 43 NY2d, at p 563, citing *People v Ingle,* 36 NY2d 413, *supra.)* Reasonable suspicion, defined as "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand." *(People v Cantor,* 36 NY2d 106, 112-113), requires more than mere " 'hunch' " or " 'gut reaction' ". *(People v Sobotker,* 43 NY2d, at p 564.) Driving through a red light, however, justifies the stop of an automobile. *(People v Erwin,* 42 NY2d 1064, 1065.)

---

**5.** Of course, while defendant did have standing to contest the frisk, the frisk did not lead to the discovery of the gun, and thus, could not provide defendant with standing to challenge its seizure.

Both Officer Gilligan and Officer Bowen testified at trial that the taxicab drove through a red light. This testimony was challenged by both defendant and Colon in their version of the incident, as well as by St. Clare, who did not believe that he had been speeding or had passed a light at the intersection. While acceptance of the officers' testimony on this point was not essential to its verdict, it is obvious that the jury found the officers to be generally credible in accepting their version of the incident as against the conflicting account offered by defendant and Colon. Thus, sufficient is shown in this record to support the finding that the taxicab in which defendant was a passenger passed a red light and that the stop was justified.

In any event, defendant's motion was properly denied without a hearing because he failed to allege facts in his moving papers which, if true, would have established that the taxicab was stopped illegally. On a suppression motion, the moving party has the burden of establishing that his own 4th Amendment rights have been violated by the challenged search or seizure. *(See, Simmons v United States,* 390 US, at pp 389-390; *Jones v United States,* 362 US, at p 261.)* "[A] defendant is required to set forth in his papers circumstances which, if admitted, would require suppression of the physical evidence." *(People v Taylor,* 97 AD2d 381; *accord, People v Sutton,* 91 AD2d 522; *see,* CPL 710.20, 710.60.) As already noted, in his moving papers, defendant alleged only that a taxicab in which he was a passenger was stopped despite the absence of any "reason to believe that any of the occupants of the vehicle had committed a crime or were committing a crime at the time of the arrest." Even if true, these allegations do not establish a violation of defendant's 4th Amendment right to be free of unreasonable searches and seizures.

Defendant's allegations ignore the fact that police officers may stop an automobile on much less than a reasonable belief that the occupants had committed or were committing a crime. They may, for instance, stop an automobile for a traffic violation. Indeed, as the Court of Appeals has noted, "[T]he factual basis required to support a stop for a 'routine traffic check' is minimal. An actual violation of the Vehicle and Traffic Law need not be detectable * * * All that is required is that the stop be not the product of mere whim, caprice, or idle curiosity. It is enough if the stop is based upon 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion' ". *(People v Ingle,* 36 NY2d, at p 420, quoting in part from *Terry*

*v Ohio,* 392 US 1, 21.) Since defendant did not allege facts demonstrating that the officers stopped the taxicab without reasonable grounds or as a result of "whim, caprice, or idle curiosity", he failed to assert a 4th Amendment violation. His pretrial motion to suppress the gun was thus properly denied. *(See,* CPL 710.20, 710.60.)

Nor is there merit to the argument that even if defendant's pretrial motion to suppress was properly denied, the trial court should have conducted a hearing to determine the legality of the stop. Defendant never renewed his motion to suppress.[6] Nor did he ever request a hearing. The record indicates that he asked only that the indictment be dismissed. Furthermore, as already noted, the evidence introduced at trial harmed, rather than helped, defendant's suppression motion. That evidence indicated that the police officers had, in fact, acted reasonably in stopping the car. Besides testifying that they followed the taxicab only after its driver drove through a red light,[7] Officers Gilligan and Bowen both further testified that the taxicab driver, while not exceeding the speed limit, was driving at a fast rate of speed. Officer Bowen explained that speeding and passing lights are ways in which taxicab drivers signal that they are in distress. Thus, had defendant sought to renew his motion to suppress the gun, the trial court would have acted properly in denying it, since the officers had an articulable basis for the stop.

Finally, we note the dissent's concern about a certain *modus operandi,* characterized by aggressive action often taken at the expense of the constitutional rights of, for the most part,

6. In any event, even had such a motion been made, the trial court would have acted properly in denying it. Pursuant to CPL 710.40 (4), a motion to suppress may be renewed at trial only if it is shown "that additional pertinent facts have been discovered by the defendant which he could not have discovered with reasonable diligence before the determination of the motion". Even now defendant does not point to any such facts.

7. Defendant argues that Officer Bowen testified that he and Officer Gilligan may have been stopped at a traffic light when they first saw the taxicab and thus concludes, "[i]f the light was red for the officers, it certainly was a green or yellow light that the cab went through." The conclusion is not justified. Officer Bowen made it clear that he and Officer Gilligan may have been parked when they saw the taxicab. He testified, "We were double-parked—I don't know whether we were waiting for the light or just stopped there observing traffic going through the intersection." Moreover, had the officers been stopped on Lenox Avenue for a red light, as defendant claims, if Officer Gilligan hesitated at all before accelerating after the light facing them turned green, the taxicab could have crossed in front of them on 112th Street against the red light before their vehicle moved.

members of minority communities, which is allegedly employed by the Police Department's Taxi Robbery Squads. We share that concern if, in fact, such a policy exists. Our function, however, is to decide each case on its own merits. The evidence speaks for itself as to the officers' reason for following the taxicab in which defendant and his companions were passengers. Whatever view one takes of the evidence on that issue, however, nothing in the record supports the conclusion that the decision to follow the taxicab was based on the racial or ethnic background of its occupants.

Accordingly, the judgment of the Supreme Court, New York County (Carol Berkman, J., on the suppression motion; Herman Cahn, J., at trial), rendered April 5, 1985, convicting defendant of criminal possession of a weapon in the third degree and sentencing him to an indeterminate term of imprisonment of from 2½ to 5 years, should be affirmed.

CARRO, J. (dissenting). Judicial regard for the effectiveness of a law enforcement practice in curtailing criminal activity does not excuse a court from carefully scrutinizing that practice for constitutional abuses, especially when it is apparent that a certain *modus operandi* is evolving which includes widespread, arbitrary and discriminatory intrusions upon the constitutionally protected civil liberties of our citizens. When confronted with such evidence a court is obliged not to shut its eyes and ears in honor of effective law enforcement, but must suppress any evidence seized as a result of such unconstitutional tactics, as the spirit and purpose of the exclusionary rule require. Concerning crime prevention tactics, the Court of Appeals has aptly noted the following: "[s]ince this function is highly susceptible to subconstitutional abuses it will be subject to the greatest scrutiny; for whereas a policeman's badge may well be a symbol of the community's trust, it should never be considered a license to oppress" *(People v De Bour,* 40 NY2d 210, 220).

At issue here are the procedures employed by two members of a Taxi Robbery Squad of the New York City Police Department. On June 15, 1984, at approximately 11:15 P.M. Officers Gilligan and Bowen stopped a livery vehicle driven by Dean St. Clare in which were riding three young Hispanic males, defendant-appellant Millan and his codefendants at trial, Colon and Veggacada. A gun was found in the car and all three passengers were charged with its possession. Only Colon and Millan were convicted, after trial, of criminal possession of a weapon in the third degree.

Defendant Millan moved for a pretrial hearing to determine the admissibility of the gun. He alleged in his motion papers that the stop was unwarranted in that the police officers had no "reason to believe that any of the occupants of the vehicle had committed a crime or were committing a crime". Of course, a stop of a car need not be based on the commission of a crime, but may be based on a mere motor vehicle infraction or the reasonable belief that the car's occupants are about to violate a law. *(People v Sobotker,* 43 NY2d 559, 563; *People v Ingle,* 36 NY2d 413, 419-420.) Thus, the defendant's affidavit may in a very hypertechnical sense be deemed insufficient to warrant a hearing because it failed to set forth facts which, if admitted, would necessarily require suppression of physical evidence. (CPL 710.60; *People v Taylor,* 97 AD2d 381.) However, it is clearly evident from the hearing court's written decision summarily denying the motion to suppress that the court fairly construed defendant's affidavit as raising the argument that the police observed nothing at all which could justify the warrantless stop. In fact, the basis for the People's objection to the motion and the hearing court's reason for denying it had nothing to do with the sufficiency of defendant's papers, but, rather, had to do with defendant's alleged lack of standing to challenge the seizure of the gun. Thus, any objection to the sufficiency of the papers has been waived and cannot be relied upon on appeal. *(See, People v Taylor, supra* [prosecutors frequently waive the formal requirements of CPL 710.60 regarding the sufficiency of the papers].)

More importantly, the hearing court erred in summarily denying the motion. The court recognized that the Taxi Robbery Squads' "stopping of cabs does indeed present a pattern" and that the "attention paid to minor traffic violations by Street Crime Unit officers, which forms the alleged bases for these stops, has aroused widespread skepticism." Nevertheless, the hearing court ruled that even if the car was unlawfully stopped, the suppression motion had to be summarily denied because defendant's individual 4th Amendment rights were not violated, due to his failure to assert a proprietary or possessory interest in the package which was searched and from which the gun was retrieved. As will be discussed below, the court's ruling does not withstand scrutiny, as it completely ignores the doctrine of fruit of the poisonous tree with respect to the stop of the car. Suffice it to say that the hearing court, which recognized the possible skeptical basis for this car stop,

erred in denying defendant's motion and denying it summarily.

However, since a trial did take place, at which the facts pertinent to the suppression motion were fully developed and at which the motion for suppression was renewed, we need not remand for a hearing and may make our own findings of fact and conclusions of law. *(See, People v Hibbler,* 111 AD2d 67; *cf. People v Le Grand,* 96 AD2d 891, 892; *but see, People v Werner,* 55 AD2d 317, 319-320 [defendant never had full opportunity at trial to explore facts pertinent to the legality of the search and seizure].)

With reference to their responsibilities on the Taxi Robbery Squad, Officer Gilligan stated that they check on the driver's safety "usually by stopping a cab [and making] inquiry to the driver as to his destination, and his pickup point with the passengers." The officer continued that if upon such a stop "anything * * * arouses [his] suspicion," he orders the passengers out and frisks them, and "if there's nothing wrong, we tell the driver to continue on his way".

Gilligan's partner, Officer Bowen, further elucidated the usual procedures of the Taxi Robbery Squad, stating that the easiest way for the officers to make the "public aware that [they] were out there to protect cab drivers * * * is to stop as many cabs as possible." When asked whether the Police Department had established any profile of persons likely to commit crimes against cab drivers, Officer Bowen responded: "Usually male Blacks, or Hispanics, in the 20's to 30's year old age group, usually dressed in dungarees, dark clothing." He added that the defendants, who were all Hispanic, fit that description.

On the night of June 15, 1984, at approximately 11:15, while stopped at West 112th Street and Lenox Avenue, Officer Gilligan, who was in plain clothes and in the driver's seat of a yellow cab, spotted a livery cab crossing the intersection of Lenox Avenue and traveling eastbound on West 112th Street. The officers pursued the cab which had three passengers in the rear seat. When the officers' car caught up with the cab at West 112th Street and Fifth Avenue, Officer Gilligan displayed his shield to Mr. Veggacada and told him to inform the driver to pull over. After the car was stopped Gilligan exited his vehicle. As he approached the cab he saw "movement in the back". He said the passengers "were turning to get a look at me." He approached the cab driver and asked the driver

where he was taking the passengers. When Officer Gilligan finished speaking with the driver, he ordered the three passengers out of the car and, as Officer Bowen stood guard, frisked each passenger. As the third passenger alighted from the cab, Gilligan purportedly saw a zippered, brown vinyl bag on the rear seat near where defendants Millan and Colon had been seated. Gilligan asked whose bag it was. According to Officer Bowen, "[n]obody acknowledged ownership of the bag." Gilligan seized the bag, "felt the weight of the weapon inside the bag" and told Bowen "we have a gun". The defendants were then arrested. In the bag Gilligan found a loaded 9mm. automatic.

Officer Gilligan testified that he could not recall having noted any "distress" signals on the part of the driver before pulling the car over and denied having witnessed the commission of any crime. During cross-examination the following colloquy took place:

"Q. Anything wrong with the taxicab—taxicab's light out in the back, taxicab speeding, taxicab go through red light?

"A. You mean the car in question?

"Q. Yes.

"A. Yes. He was going a little fast and when he crossed the intersection of Lenox Avenue the lights were—where we were facing, was green for us and we were facing northbound.

"Q. So, he went through the red light?

"A. Yes.

"Q. Do you have a copy of the ticket that you gave the driver?

"A. I didn't give a summons out.

"Q. Didn't give the driver a summons.

"A. No.

"Q. Did you note the fact any place, that this driver went through a red light in your notes?

"A. No."

Further in the trial, during a second cross-examination, the following testimony was elicited:

"Q. * * * [Y]ou said there was nothing unusual about this particular automobile that you notived [sic-noticed]?

"A. Not that I recall.

"Q. The driver wasn't in distress?

"A. Not that I recall.

"Q. Wasn't making any signals to you?

"A. Not that I recall.

"Q. And you observed nothing unusual or strange about this car? Am I correct?

"A. About the car? Not that I recall. No.

"Q. And yet, you followed it?

"A. Yes * * *

"Q. Now, you followed this automobile, which had given you no cause for suspicion and when you get close to it, you talk to one of the occupants of the automobile. Am I correct.

"A. That's correct * * *

"Q. Did you have reason to believe that the gypsy cab driver was committing something wrong or had done something wrong.

"A. That point was traveling a little fast and I believe he had gone through the light at Lenox Avenue and West 112th Street.

"Q. But, you are not sure that he had done so? You believe, right?

"A. Pardon me?

"Q. You, believe, but you are not sure?

"A. I believe that is the reason why we went after him. Yes.

"Q. And if he had, as co-counsel said before—you would have given him a ticket, wouldn't you? Serious thing to cross a red light.

"A. We don't carry summonses.

"Q. Oh.

"A. Usually we have to 85 [call]—a uniform radio car, if a summons is to be issued * * *

"Q. So, you could have easily asked for them to come give the driver of the car a summons if necessary right?

"A. Yes.

"Q. Butk [sic], you didn't do it?

"A. At that time, no.

"Q. Did you do that at anytime?

"A. No, Not that I recall. No."

When asked why he frisked the passengers, Officer Gilligan replied, "I do it for my own safety * * * One in a high-crime area[,] West 112th Street and 5th Avenue, it's a high-crime area; late at night, and I do it for my own protection." On

redirect the prosecutor, in a highly leading question, asked Gilligan whether the cab driver's having gone through a red light and traveling fast gave the officer "cause to follow the taxicab," to which Gilligan replied, "yes".

Regarding the car stop, Officer Bowen, who testified after Gilligan, stated that he and Gilligan observed the cab go through a red light, which he stated could be a signal that a driver is in "distress". Consequently, they pulled the cab over. Later, during cross-examination, he stated that "we felt that he ran through a red light". However, Bowen also admitted that this particular driver gave no indication of feeling unsafe. When asked if he had planned to give a ticket to the cab driver for going through the red light, Bowen answered: "That wasn't our intention." Officer Bowen did claim, however, to have asked the driver why he went through the red light. However, he also stated that he did not speak to the driver until after the defendants were arrested.

Dean St. Clare, the livery cab driver, testified for the People and stated that shortly after picking up the defendants at 112th Street and Seventh Avenue he was pulled over by the police. St. Clare testified that he did not go through a red light or drive fast and did not do anything that could signal distress. He noticed no movements in the back seat. When Officer Gilligan approached St. Clare, he identified himself as from the Robbery Squad Unit and told St. Clare: "Give me a few minutes." No mention was made to St. Clare of his driving. St. Clare also testified that the officer who frisked the passengers then "went in the cab and was searching in the back * * * for about a minute or so." After the search, the officers asked St. Clare questions about his prior passengers and the destination of the defendants. Defendant Millan and his codefendant Colon testified similarly.

I find that the police officers' testimony was not credible and indeed "has all appearances of having been patently tailored to nullify constitutional objections." *(People v Garafolo,* 44 AD2d 86, 88; *see also, People v Quinones,* 61 AD2d 765.) This conclusion is drawn from the fact that their testimony was flatly contradicted by the livery cab driver, who had no interest in the outcome of this case, and the fact that the officers' own testimony was hesitant and wavering and at times inconsistent. Also affecting my judgment in this case is the fact that there have been a profusion of cases involving taxicab or livery cab stops by the Taxi Robbery Squad with similar fact patterns, suggesting a consciously developed stra-

tagem of arbitrarily stopping and searching minority passengers of cabs traveling in Harlem or Upper Manhattan, passengers who, the People routinely assert, have no standing to challenge these searches and seizures. *(See, People v Moore,* 126 Misc 2d 482; *People v Jones,* 125 Misc 2d 91; *People v Castro,* 125 Misc 2d 15; *People v Judge,* 117 Misc 2d 912; *People v Bay,* NYLJ, Dec. 11, 1984, p 7, col 1; *People v Riddick,* NY County 1984, Index No. 7661/83.)

One telling sign of the weakness in Officer Gilligan's testimony is the fact that his testimony at trial was wavering. At first he gave no reason for having stopped the livery cab. Then, he stated that the car had gone through a red light. After that he agreed with the statement of a defense counsel that the driver had done nothing suspicious or criminal, nor given any signal of distress. Still later, he stated that he "believed" he had stopped the cab because it had gone through a red light and was traveling fast. It was only in answer to a highly leading question from the prosecutor that the officer finally asserted in a firmer manner that the traffic infraction was the basis of the stop.

In contrast to this vacillating testimony was the more candid and firm testimony of the livery cab driver, a witness for the prosecution, who stated that he had not gone through a red light and was not driving fast. That no traffic infraction occurred satisfactorily explains the otherwise curious fact that Officer Gilligan's write-up of this incident failed to include any mention of the cab having gone through a red light. It likewise explains why the officers failed to radio a patrol car to have a summons issued, even though that is what they testified their normal procedure was, presumably to protect their undercover identity.

Although Officer Bowen stated more assuredly than Gilligan that they had stopped the car because of the traffic infraction, he, nevertheless, rather inconsistently admitted that they never intended to give a summons to the driver. He also claimed to have asked the cab driver why he went through the red light, a fact the driver denied. Even if Bowen did speak with the cab driver, this did not take place, according to Bowen's own testimony, until after the passengers were frisked and the gun found, conduct which is inconsistent with a police stop pursuant to a traffic infraction.

I conclude, therefore, that the assertion that the driver went through a red light was in the words of *People v Garafolo*

*(supra,* at p 88), "patently tailored" and offered only "to nullify" the constitutional objection to this car stop and is but one example of an established police practice of randomly stopping and searching minority passengers traveling in taxicabs and livery cabs in minority neighborhoods. " '[A]bsent at least a *reasonable* suspicion that its occupants had been, are then, or are about to be, engaged in conduct in violation of law' (including traffic infractions), the stopping of an automobile constitutes an impermissible seizure". *(People v Rosario,* 94 AD2d 329, 332.)* Discounting the patently tailored evidence of the traffic violation, there was not a shred of objective evidence to indicate that any of the persons in this livery cab were committing or about to commit any violation of law. Rather, the stop here is an example in its purest form of the exercise of an unbridled discretion and unfettered governmental intrusion that the 4th Amendment was meant to prohibit. The procedure here, with its ethnically offensive and iron-handed overtones, cannot be countenanced and permitted to thrive with the tacit consent of courts which fail to open their eyes and mete out the justice that is due to combat such reprehensible police actions. That these practices are thriving and evolving into an established police art form is shown by the increasing incidence of very similar cases in our courts. *(See,* cases cited *ante.)*

Even the testimony of the officers at this trial reveals that a discriminatory practice of arbitrarily stopping minority taxicab passengers has developed. Officer Bowen quite proudly claimed that the best way to deter crimes against cab drivers is to "stop as many cabs as possible" and let the public know "we were out there to protect cab drivers". Officer Bowen also admitted that their focus is on young male minority passengers in cabs in minority neighborhoods, a description which undoubtedly fits a substantial percentage of the population in Harlem and Upper Manhattan, even those without the slightest inclination towards criminality. Such a broad and vague profile and the policy of stopping as many cabs as possible ensures that a frightening number of innocent people will be forced to undergo the highly intrusive and ignoble experience of being unreasonably detained and frisked merely because they possess certain salient characteristics of people who allegedly commit crimes in these areas, characteristics which they share in common with many of the residents of these neighborhoods.

Additionally, the officers' conduct immediately after the stop

confirms my belief that this was nothing more than a random stop and search in the vague hope that a weapon would be uncovered. Thus, even though the cab driver failed to indicate to the officers that he was in any danger, Officer Gilligan proceeded to order the three passengers out and frisk them. His only explanation for frisking them was fear for his safety because he was in a high-crime area and it was nighttime. However, merely stating that he felt his safety was in danger, without pointing to the objective facts upon which this fear was based was insufficient to justify a frisk. While passengers in a car lawfully stopped may, in appropriate cases, be ordered out of the car *(People v David L.,* 56 NY2d 698; *People v Vasquez,* 106 AD2d 327, 329; *People v Rosario,* 94 AD2d 329, 333, *supra),* these cases have not gone so far as to hold or even suggest that merely because these persons are passengers in a car they do not have the same rights any other citizen has to be free of an unreasonable frisk except when the "officer reasonably suspects that he is in danger of physical injury by virtue of the detainee being armed (CPL 140.50, subd 3)." *(People v De Bour,* 40 NY2d 210, 223, *supra.)*

This record presents no objective evidence by which the officers could have reasonably believed that these passengers were armed. The mere movements of these passengers in turning around to look at the officers after the car was pulled over was certainly conducive to the innocent and innocuous interpretation that they were merely curious as to why these officers had stopped the cab. As stated by the Court of Appeals in *People v De Bour (supra,* at p 216): "We have frequently rejected the notion that behavior which is susceptible of innocent as well as culpable interpretation, will constitute probable cause * * * It is equally true that innocuous behavior alone will not generate a founded or reasonable suspicion that a crime is at hand." "Furthermore, the combining of such otherwise innocuous actions and behavior in a setting described as a 'high crime area' does not expand the powers of the police to the detriment of those individuals who happen to live or work in, or are passing peaceably through, such a neighborhood." *(People v Cornelius,* 113 AD2d 666, 670.) While I recognize that the gun was not discovered pursuant to the frisks, mention is made of their unreasonableness to emphasize that what these officers were bent on conducting was a fishing expedition for weapons, no matter what the cost to defendant's constitutional rights.

I also credit the cab driver's testimony that Officer Gilligan

spent about a minute and a half "searching" the rear passenger area and do not credit the officer's statement that he saw the vinyl bag on the seat. It is noteworthy that it was only the cab driver who remained in the car when Officer Gilligan stepped inside, and he certainly had no reason to make this testimony up. Even had I credited the officers' testimony as to the basis of the stop, their conduct subsequent to that, frisking the passengers and searching the rear compartment, bore not the slightest resemblance to a normal police response to a routine traffic stop. The intrusions which followed the stop were not in the least reasonably related to the promotion of any legitimate government interest in investigating a traffic infraction. (See, People v Marsh, 20 NY2d 98, 101.)

Despite the unconstitutionality of this car stop, the People hope to insulate from review the police officers' conduct by arguing that even assuming defendant has standing to contest the stop of the car, he "failed to establish standing to make his suppression motion because he neither claimed an interest in the gun seized, nor established a legitimate expectation of privacy in the zippered bag containing the gun which was found in the rear compartment of the cab." This argument, however, totally ignores the doctrine of and purpose behind the "fruit of the poisonous tree". The majority relies instead on its conclusion that the stop was lawful and defendant had no standing to contest the search of the rear passenger seat. These questions of standing must be addressed.*

In *Rakas v Illinois* (439 US 128), the United States Supreme Court considered an aspect of the question of standing of a passenger with respect to a search of a car and concluded that in that case the passengers could not contest the search of the glove compartment or the area beneath a seat because these were areas of the car in which a passenger qua passenger had no legitimate or recognized expectation of privacy *(supra,* at pp 148-149). This legitimate expectation of privacy in the area searched or item seized is the standard by which courts determine whether a person's individual 4th Amendment rights have been violated *(supra,* at p 143; *see also, United States v Salvucci,* 448 US 83, 92). Justice Powell in his concurring opinion noted that the question decided by the court was a very narrow one, as the defendants in *Rakas* had

---

* It is irrelevant whether the issue is framed in terms of standing or substantive 4th Amendment doctrine as either approach produces the same result. *(Rakas v Illinois,* 439 US 129, 139.) The parties below discussed the issue in terms of standing.

not challenged the constitutionality of the police conduct in stopping the car and ordering the passengers out, but had only challenged the search of the car *(supra,* at pp 150-151 [Powell, J., concurring]). The dissenting opinion of Justice White went even further, stating that although not argued in *Rakas,* the defendants, of course, had standing to challenge the legality of the stop and the evidence found as a result of the stop *(supra,* at p 160 [White, J., dissenting]). In total, two thirds of the court, two concurring Justices and four dissenters, recognized that a passenger has standing to object to an unlawful stop of a car.

In *People v Smith* (106 AD2d 525) the Second Department interpreted Justice Powell's concurring opinion in *Rakas (supra)* to mean that a passenger in a vehicle does have standing to object to an unlawful stop as it entails police conduct which intrudes on his 4th Amendment protection against an unreasonable seizure of his person. The court stated that if either the stop of the car or the removal of a passenger is unreasonable under the 4th Amendment, then that passenger has standing to object to those constitutional violations and to have suppressed any evidence found in a car which is their fruit. (106 AD2d 525, 526, *supra; see also,* 1 Ringel, Searches & Seizures, Arrests and Confessions § 11.7, at 11-44 [2d ed]; 1 LaFave and Israel, Criminal Procedure § 9.1, at 726 [1984].)

That passengers of a vehicle, which is unlawfully stopped, have standing to challenge the stop is a conclusion also supported by the decision *Delaware v Prouse* (440 US 648), which states that such a stop, just like a *Terry* stop, is a seizure of the occupants of the automobile and is to be governed by the constitutional strictures against unreasonable searches and seizures *(supra,* at p 653).

It is, then, only natural to conclude that a person who hires a cab, intending to reach a certain destination, has been personally seized and detained when that cab is stopped and has standing to contest the propriety of that stop. *(People v Moore,* 126 Misc 2d 482, *supra; People v Jones,* 125 Misc 2d 91, *supra; People v Castro,* 125 Misc 2d 15, *supra; cf. People v Smith,* 106 AD2d 525, *supra; People v Nelson,* 127 Misc 2d 583; *People v Green,* 121 Misc 2d 522; *People v Aguirre,* 111 Misc 2d 586; *contra, People v Judge,* 117 Misc 2d 912, *supra.)*

Having determined that defendant has standing to contest the stop and that the stop and seizure were unconstitutional, we must apply the doctrine of the "fruit of the poisonous

tree", which provides that any evidence obtained as a result of the "exploitation" of that illegal seizure must be suppressed. *(Wong Sun v United States,* 371 US 471, 484-486; *Nardone v United States,* 308 US 338, 341.)

In this case there can be no question but that the seizure of the gun was the direct, exploitative result, indeed, the very purpose of this unlawful stop and detention. Immediately upon stopping this cab. Officer Gilligan put into motion certain conduct designed solely to obtain incriminating evidence. The gun was found as a direct consequence of the illegal nature of the stop and must be suppressed. *(See, People v Boodle,* 47 NY2d 398, 404-405; *People v Cantor,* 36 NY2d 106, 114.)

Ignoring the taint doctrine, the People instead separate the police conduct into stages and would require that defendant establish standing as to each stage. Thus, they argue that even if defendant has standing to object to the stop of the car, he lacks standing to object to the search of the vinyl bag as to which he has no legitimate expectation of privacy because of his failure to claim ownership of the bag and its contents. Breaking up the sequence of the official misconduct in this manner totally flouts the purpose of the fruit of the poisonous tree doctrine, which is to deter unlawful police conduct.

Furthermore, the People have misconstrued the case law upon which they rely as support for their claim. For example, the Second Circuit case, *United States v McGrath* (613 F2d 361, *cert denied sub nom. Buckle v United States,* 446 US 967 [1980]), actually supports defendant's position that all he need prove is that the seizure of the gun directly flowed from the unlawful stop. In that case the stop of the car was deemed proper, and, consequently, the court ruled that no illegality flowed from that stop. The subsequent search of a briefcase in the car, which belonged to a passenger and not the defendant, was, therefore, not tainted by any prior unlawful conduct. Accordingly, the defendant, who had no proprietary interest in the briefcase, had no standing to challenge this search *(supra,* at p 365). Likewise, in the North Carolina case of *State v Jordan* (40 NC App 412, 252 SE2d 857), the defendant did not contest the propriety of the car stop, which the North Carolina court appears to have accepted as lawful, but, rather, contested the lawfulness of the search of the pocketbook of a passenger, as to which he had no proprietary or possessory interest. In this case, however, defendant does contest the

lawfulness of the stop and argues that the unlawfulness tainted the discovery of the gun.

The majority takes a different path for upholding the search. Upon crediting the officers' testimony, it concludes that the stop of the taxicab was reasonable and no illegality flowed from it. Then, it states that because defendant had no legitimate expectation of privacy in the rear passenger seat of the taxicab, he could not invoke the protection of the 4th Amendment with respect to the search of the seat. Relying on the principles set forth in *Katz v United States* (389 US 347) and *Rakas v Illinois* (439 US 128, *supra)* it concludes that defendant could not have rationally or reasonably expected privacy in an area which he necessarily had to share with a stranger, the driver, who was under no obligation to keep the activities of his passenger confidential. I do not find this argument persuasive for the reasons which follow.

As discussed above, *Rakas v Illinois (supra)* held that mere invited passengers in an automobile had no legitimate expectation of privacy in such areas of the car as the trunk, the glove compartment or areas under the seats. Whether or not a passenger has a privacy interest in the area in which he is seated, and legitimately present, however, is a question that was not addressed in *Rakas. Rakas* did, however, advance a two-pronged test by which future courts could analyze whether or not a legitimate expectation of privacy in a certain area exists. Under that test we must determine whether a defendant has an actual subjective expectation of privacy in the area searched and whether that expectation is one which society is prepared to recognize as reasonable. *(Rakas v Illinois,* 439 US, at p 144; *see also, People v Lerhinan,* 90 AD2d 74, 75-76.)

Although a person who hires a cab must, of course, share space in the cab with a stranger, the driver, he still has a definable subjective expectation of privacy in the area of the cab which he personally occupies and in which he places any items he is carrying, and he has the right to insist that the cab be used exclusively by him for the rented period. This right to exclude others based on his hiring the cab elevates the subjective expectation of privacy of a taxicab passenger over a passenger in a private car, who has no right to insist to the owner or driver of the car where he shall go or who else shall be allowed in the car. Additionally, society recognizes the taxicab passenger's right to exclude others from the taxicab for the duration of the rental period. The fact that the

passenger cannot exclude the driver from the taxicab does not extinguish his privacy expectation in the taxicab but, instead, diminishes it to the area which he legitimately occupies for the rented period. That the driver is under no obligation to keep the activities of a passenger confidential is in my view not a relevant consideration. A hotel manager is under no obligation to keep the activities of a hotel guest confidential, yet no one would suggest that the hotel guest's expectation of privacy is extinguished thereby. Accordingly, I conclude that a passenger in a taxicab has standing to contest a stop of the cab and a search of the area of the car which he occupies. I also conclude that the stop here was unlawful, and the gun which was seized as the tainted fruit of that stop must be suppressed. Therefore, I would reverse this conviction and dismiss the indictment.

FEIN, J. (dissenting). I concur in Justice Carro's dissent, but would add the following.

I agree that the stop of the taxicab was plainly without lawful basis. The equivocal testimony of the police officers as to the speed of the taxicab and that it may have passed the red light as an explanation for stopping the cab, coupled with their admission that they tend to stop taxicabs occupied by young Hispanics or blacks in dark clothes, as part of their anticrime duty, suggests that the latter was the real reason for the stop of the vehicle.

Their plain purpose was to check the passengers despite the absence of any suspicious conduct by them or by the driver. That this was the purpose of the police is made clearly evident by the limited attention they paid to the taxicab driver who swore that he was neither speeding nor passing a red light. The police obviously had no concern with him.

Their reliance on the claimed suspicious conduct of the passengers has a hollow ring. It is suggested that because the passengers turned around to observe the approach of the police, the passengers were somehow engaged in suspicious activity warranting further inquiry. It is notable that in order to get the taxicab driver to stop, the plain-clothes police officer told one of the passengers (the one not convicted) to tell the driver to stop. Without any further inquiry, the police forthwith ordered the passengers out of the cab and frisked each of them, without any basis. The majority contends they have no cause to complain because no contraband was found upon them. I respectfully disagree (see, People v Le Grand, 110

AD2d 539, 544 [Fein, J., concurring]). Having found nothing on the passengers, the police then began the search of the interior of the passenger compartment, in which they finally found the zippered envelope containing the gun.

The entire pattern of police behavior clearly violated the 4th Amendment restriction against "unreasonable searches and seizures", as Justice Carro has carefully pointed out.

The majority concludes that defendants were not entitled to a hearing on the issue of suppression since as taxicab passengers they had no standing because they had no legitimate expectation of privacy in the passenger compartment. I suggest that *Rakas v Illinois* (439 US 128), on which the majority relies, deals only with a passenger automobile and not a taxicab. Indeed, footnote 16 (439 US, at p 149) notes, in distinguishing *Rios v United States* (364 US 253), that "Rios had hired the cab and occupied the rear passenger section."

Moreover, there was no activity upon which to base the stop which "is justified only when conducted pursuant to 'nonarbitrary, nondiscriminatory, uniform' highway traffic procedures, or when there is specific cause or, at least, *reasonable* suspicion that a motorist is about to violate a law." *(People v Sobotker,* 43 NY2d 559, 563.) There was lacking "the quantum of knowledge sufficient to induce an ordinarily prudent and cautious man under the circumstances to believe criminal activity is at hand" *(People v Cantor,* 36 NY2d 106, 112-113). There was merely a " 'hunch' " or " 'gut reaction' " *(People v Sobotker,* 43 NY2d, at 564).

The *modus operandi* of the police was characterized by aggressive action taken at the expense of the constitutional rights of these defendants. It is our obligation to protect those rights, albeit a gun was found. On this record, it appears that the stop and seizure were based on who the defendants appeared to be, and the fact that they were stopped in a so-called "high crime area". This was part of a police pattern ignoring the fundamental constitutional principle that neither consideration warranted the police action.

The majority suggests that our function is to decide each case on its own merits. I agree. However, the only "merits" here were that a gun was discovered. That is not sufficient. Our function under the circumstances is to recognize that in vindicating the rights of these defendants, albeit they were found guilty of possession of a gun, we vindicate the rights of all.

As Justice Stevens has noted, dissenting in *Moran v Burbine*

(475 US —, —, 106 S Ct 1135, 1149-1150), "Justice Frankfurter [dissenting in *United States v Rabinowitz,* 339 US 56, 69] similarly emphasized that it is 'a fair summary of history to say that the safeguards of liberty have been forged in controversies involving not very nice people.' And, almost a century and a half ago, Macaulay [in 1 History of England, at 482] observed that the guilt of Titus Oates could not justify his conviction by improper methods: 'That Oates was a bad man is not a sufficient excuse; for the guilty are almost always the first to suffer those hardships which are afterwards used as precedents against the innocent.' "

A continuing erosion of the ability of victims of unconstitutional searches and seizures to obtain a remedy for the invasion of their rights destroys the constitutional guarantee both with respect to the innocent as well as the guilty.

Obviously, courts are called upon to decide whether evidence should be excluded only when a search has been "successful". However, with all due respect, what we often overlook is that the standards we follow in determining what governmental conduct is reasonable, in searches and seizures directed at persons who are found guilty, should apply equally as well to those who are innocent. We have no evidence as to the number of individuals who are subjected to such searches and then released because nothing is found. Our concern should also be for their rights.

"However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness" *(Miller v United States,* 357 US 301, 313).

In deciding this case, the majority invites law enforcement officials to proceed in a manner which invades the constitutional rights of not only the defendants convicted here, but of all of us.

KUPFERMAN, J. P., and ASCH, J., concur with SULLIVAN, J.; CARRO, J., dissents in an opinion in which FEIN, J., concurs; FEIN, J., also dissents in a separate opinion.

Judgment, Supreme Court, New York County, rendered on April 5, 1985, affirmed. The case is remitted to the Supreme Court, New York County, for further proceedings pursuant to CPL 460.50 (5).