THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v GEORGE FOSTER, EARL GRAY and DARRYL GRIFFIN, Respondents.

First Department, November 17, 1981

**APPEARANCES OF COUNSEL**

*John Lenoir* of counsel *(Mark Dwyer* and *Vivian Berger* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Susan C. Thon* of counsel *(William E. Hellerstein,* attorney), for Earl Gray, respondent.

*Daniel Crupain* for Darryl Griffin, respondent.

*Rita Hayman* and *Donald Ostwald* for George Foster, respondent.

**OPINION OF THE COURT**

BLOOM, J.

This case confronts us, once again, with the ever troublesome problem of the degree of police intrusion warranted by an anonymous 911 call. During the early morning hours of April 4, 1980, Police Officer Collins and Detective Cado-

gan were on radio motor patrol in the 28th Precinct. According to the police method of evaluating the level of crime throughout the city, the 28th Precinct station house is an "A" house, that is the area serviced by it has a high incidence of crime.

At approximately 4:30 A.M. the two officers received a radio run, based on an anonymous telephone call to "911". The purport of the call was that three male blacks were heading south from 152nd Street and Eighth Avenue in a "wanted" car, a red Mercury Cougar bearing the registration 371 *JBJ*, and that they possessed guns. A short time thereafter they received a communication from one of the motor patrols in an adjacent precinct that the area north of 135th Street had been canvassed and that the sought after vehicle had not been seen.

Collins and Cadogan, who had been cruising on 123rd Street, then proceeded to Seventh Avenue where they stationed their car. A minute or two thereafter the police officers saw a vehicle pull up to the southwest corner of 123rd Street and Seventh Avenue and double park. The car appeared to be red, but in the darkness the officers, whose car was stationed across the street, could not be certain. Accordingly, they drove their car across the intersection to obtain a better view of the double parked vehicle. They saw that the automobile was a red Mercury Cougar bearing the registration 371 *JVJ*.

When first the officers observed the car they noted that it had three occupants. One of the occupants, the driver, exited from the vehicle and entered a store. He returned to the auto approximately a minute later.

Officer Collins then radioed the precinct that they had the red Mercury Cougar, registration number 371 *JVJ* under observation and requested the assistance of a backup team. As soon as the backup team consisting of Officers DiVagno and McNeill arrived, the four officers exited from their vehicles, some with guns unholstered and others with guns drawn, and approached the red Cougar. Collins and Cadogan came up on the driver's side of the vehicle while DiVagno and McNeill moved toward the passenger side. McNeill ordered the three men in the

Cougar "to raise their hands up, put them on the dashboard and the back of the rear seat where I could see them". Griffin and Gray, who occupied the front seat of the vehicle, obeyed McNeill's order. Foster, who occupied the rear seat, did not comply. He "leaned forward and bent over". During all of this period Foster's hands were hidden from the officer's view. McNeill was required to repeat his order two or three times before Foster straightened up and placed his hands atop the back of the seat in front of him.

At this point McNeill directed Gray and Foster, the occupants of the passenger side front and back, to step out of the automobile. They complied as did Griffin with the order of one of the other officers. McNeill then reached under the front seat "to where the person [Foster] leaned" and recovered a loaded gun which he unloaded and gave to Collins.

The hearing court found that Collins and McNeill, the two police officers who testified, "were frank, candid, trustworthy and that their testimony was marked by no serious inconsistencies or contradictions, and had the force and flavor of credibility". It found further that the facts were as we have recited them. Nevertheless, and bottoming its holding on *People v Elwell* (50 NY2d 231) it concluded that the intrusion was unwarranted. Accordingly, it suppressed the weapon. We disagree. Hence, we reverse, reinstate the indictment and remand for trial.

The Fourth Amendment to the Federal Constitution provides, as does the opening paragraph of section 12 of article I of our State Constitution, that: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized".

Although the amendment is addressed solely to a search made pursuant to a warrant, the law has long recognized the right of the police to make a search contemporaneous with and as an incident to a lawful arrest *(Weeks v United States,* 232 US 383; *Agnello v United States,* 269 US 20;

*Carroll v United States,* 267 US 132; *United States v Ventresca,* 380 US 102).

Here, however, we are confronted with a seizure of the persons of the defendants and a search of the vehicle in which they were riding prior to their arrest. Initially therefore, we must determine whether such a seizure and search may be valid absent a prior arrest. In that regard *Carroll* instructs us (267 US 132, 158-159, *supra)* that: "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for the belief that the contents of the automobile offend against the law. The seizure in such a proceeding comes before the arrest".

Probable cause, like negligence, is an imprecise and elastic term, incapable of exact definition. Its amorphous quality renders it a morass for trial and appellate courts alike, except in the more obvious circumstances. Upon occasion it has been negatively defined as evidence less than that necessary to justify conviction. " 'There is a large difference between the two things to be proved [guilt and probable cause] * * * and therefore a like difference in the *quanta* and modes of proof required to establish them' " *(United States v Ventresca,* 380 US 102, 108, *supra,* quoting from *Brinegar v United States,* 338 US 160, 173). However, to establish probable cause there must be evidence available to the police officer sufficient to lead a person of his experience and sophistication to reasonably conclude that a crime had been or was being committed. Here, the two officers who responded initially received information via police radio, concededly anonymous in origin. The one discrepancy between the facts observed and the information transmitted, the difference in the middle letter of the registration, is of no significance, particularly since the letters involved are so similar in sound. The officers called for a backup team and upon its arrival proceeded to the Mercury with guns drawn or unholstered. Once there, Officer McNeill directed the occupants to place their hands on the dashboard and on the top of the front seat so that they would be in open view. Griffin and Gray complied with the order. Foster, on the other hand, did not. He slumped forward, dropping his hands so that they could

not be seen. He did not place his hands upon the top of the front seat until the order had been repeated two or three times. To a police officer of experience and sophistication operating in a high crime area the reasonable conclusion was manifest: Foster was secreting a weapon or some other contraband. With this observation the anonymous information ripened into probable cause. Certainly, it warranted the limited intrusion which followed.

The approach with guns unholstered or drawn, while indisputably a seizure *(People v Boodle,* 47 NY2d 398), was neither unreasonable nor inappropriate. Given the information at the disposal of the officers they were justified in assuming that they were in danger and that such action on their part was constitutionally protected *(Terry v Ohio,* 392 US 1). "It would, indeed, be absurd to suggest that a police officer has to await the glint of steel before he can act to preserve his safety" *(People v Benjamin,* 51 NY2d 267, 271).

Nor are either *People v Elwell* (50 NY2d 231, *supra),* or *People v Dinkins* (76 AD2d 655) to the contrary. In *Elwell* the sole basis for the search was the anonymous telephone call. That the police observed a number, even a large number, of details each consonant with innocent activity, which dovetailed with the information supplied by the informer was insufficient to establish probable cause. "Probable cause for such an arrest or search will have been demonstrated only when there has been confirmation of sufficient details suggestive of or directly related to the criminal activity informed about to make reasonable the conclusion that the informer has not simply passed along a rumor, or is not involved (whether purposefully or as a dupe) in an effort to 'frame' the person informed against". *(People v Elwell,* 50 NY2d 231, 234-235, *supra.) Dinkins* involved an anonymous 911 phone call to the effect that a "man with a shotgun" was in a parked car bearing a specified registration plate and located in a specified area. When the police officers arrived on the scene the sole occupant of the car was exiting from it. One of the officers proceeded to the vehicle, opened the door and found the shotgun while the other officer held the defendant at gunpoint. At no time did the police observe Dinkins engage

in any activity which might reasonably be interpreted to be criminal.

There seems little doubt but that in this case the anonymous tip was sufficient to trigger the common-law right of inquiry. However, standing alone, it did not warrant any more intrusive police action.

"A police officer is entitled, and in fact is duty bound, to take action on a radio call". *(People v Benjamin,* 51 NY2d 267, 270, *supra.)* Once on the scene, however, the officer may make his own observations and reach a conclusion with respect thereto based upon his knowledge of street conditions, sophistication and experience *(People v Williams,* 41 NY2d 65; *People v Stroller,* 42 NY2d 1052). That was precisely what Officer McNeill did in this case. His observation of Foster's actions and the conclusion based thereon, provides the essential distinction between this case on the one hand and *Elwell* and *Dinkins (supra)* on the other. Those observations and the conclusion which he reached as a result thereof supplied the link missing in those cases, a reasonable suspicion that criminal conduct was afoot.

Accordingly, the order of the Supreme Court, New York County (KLEIMAN, J.), rendered July 28, 1980, suppressing physical evidence and the order predicated thereon, dismissing the indictment entered November 26, 1980, should be reversed, on the law, the motion to suppress physical evidence denied, the indictment reinstated and the matter remanded to the Supreme Court, New York County, for further proceedings.

SULLIVAN, J. P., ROSS, LUPIANO and FEIN, JJ., concur.

Order, Supreme Court, New York County, entered on July 28, 1980, and order of said court, entered on November 26, 1980, unanimously reversed, on the law, the motion to suppress physical evidence denied, the indictment reinstated and the matter remanded to the Supreme Court, New York County, for further proceedings.