THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v NATHAN DAVIS and REGINALD HARRIS, Respondents.

First Department, September 15, 1987

## APPEARANCES OF COUNSEL

*Catherine M. Cook* of counsel *(Mark Dwyer* and *Donald Davidson* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Ira Mickenberg* for Reginald Harris, respondent.

*Faith O'Neal* of counsel *(Philip L. Weinstein,* attorney), for Nathan Davis, respondent.

### OPINION OF THE COURT

WALLACH, J.

On this appeal we are called upon to subject to careful scrutiny the procedures of that unit of the New York City Police Department assigned to the mission of suppressing taxicab robberies. The particular issue before us is whether the seizure of two handguns from the passenger compartment of a livery cab violated the constitutional rights of these defendants.

At the suppression hearing Police Officer Robert Biondo, a 15-year veteran of the New York City Police Department, testified that during the course of his 2½-year assignment to the street crime unit he was, on November 9, 1983, at about 7:30 in the evening, driving a yellow decoy medallion taxicab accompanied by Officers John Carberry and James Simrod. The basic assignment of the taxi squad street crime unit is prevention of assaults and robberies against cabdrivers particularly in high-crime areas. Parked eastbound at such an area, the intersection of 145th Street and Bradhurst Avenue in Manhattan, a livery cab passed the officers on the left with two male passengers in the back seat. As Officer Biondo looked in his rearview mirror and before the car passed, he observed that the livery cab was proceeding with its bright lights up, namely, with four headlight beams instead of the usual two. Biondo further testified that the use of bright beams as a signal for a cabdriver in distress had been widely publicized by the police to cab operators and had been in use about 10 years before this incident. In response to what he supposed was a distress signal, Biondo pulled his cab behind the livery vehicle, Officer Carberry activated an inside dashboard red flashing light, and by means of honking his horn and hitting his bright lights, Biondo signaled the livery cab to pull over and stop. In the course of the one-block pursuit with his car directly behind the livery cab, Officer Biondo testified that the passenger directly behind the driver looked over his right shoulder three times and made a quick forward bending motion (defendant Davis). Biondo also observed the other passenger sitting on the right-hand side of the vehicle look over his left shoulder and make a jamming motion with his

right hand, working the right shoulder up and down (defendant Harris).

When the livery cab stopped, Officer Biondo approached on the driver's side, Officer Carberry approached on the passenger side, and Officer Simrod stood directly behind the livery cab. Each officer, in plain clothes with his badge displayed on a neck chain, had drawn his gun. Carberry opened the back door on the passenger side and asked the two defendants to step out from that side. Simultaneously Officer Biondo opened the door on his side and saw the handle of a revolver protruding from under the driver's seat beneath where Davis had been sitting. Directing his attention to the place where defendant Harris had been sitting, Biondo noticed that the grip of a handgun was exposed in a space between the two rear seats. At this juncture the two pistols were seized and defendants were arrested. Following Biondo's testimony, the parties stipulated that the cabdriver, if called as a witness, would testify in accordance with his Grand Jury testimony that he did not know whether his high beams were on, and that he was not consciously sending a distress signal.

The suppression court's findings credited Officer Biondo's testimony that the livery cab's high beams were on, and also found that this condition constituted a long-standing distress signal between cabdrivers and the police. However, the court expressed skepticism regarding the credibility of Officer Biondo's testimony that he found the guns in plain view. Declining to resolve that question, the court ruled that the police had engaged in "a major intrusion" on defendants' Fourth Amendment rights without first inquiring of the cabdriver whether he was in any difficulty, and further, that because the three policemen had their guns drawn when they approached the livery cab, no legitimate safety concern could justify their direction to defendants to exit the cab. On the record, and the court's factual findings made thereon, we disagree, and reverse with new findings.

In light of our recent decisions in cases involving police vehicular stops, it is appropriate to divide for analytical purposes the police conduct here into three distinct segments: (1) the stop of the vehicle; (2) the forcible removal of defendants therefrom at gunpoint; and (3) the search of the rear of the cab after defendants had completed their compulsory egress. Although, from the point of view of the officers on the scene, this was one continuous and rapidly unfolding transaction, courts which have considered the question have devel-

oped such a partitioned approach for the purpose of constitutional review.

(1) *The Stop:* We have held *(People v Madera,* 125 AD2d 238) that a passenger in a car has standing to challenge the legality of both a police stop, and his forcible removal from the vehicle, as constituting an unreasonable seizure of his person subject to Fourth Amendment protection. Here, however, there existed a sufficiently objective basis for the stop by reason of the well-established high beam signal. Thus, there was a "reasonable suspicion based on articulable facts to believe that the person was involved in criminal activity or posed a danger to the officer" *(People v McLaurin,* 120 AD2d 270, 273), which justified the gunpoint stop. That the driver did not intend to signal did not, of course, alter the appearances upon which the police were entitled to act.

(2) *The Forcible Removal of Defendants:* Also, in *McLaurin (supra),* expanding upon the result reached by the United States Supreme Court in *Pennsylvania v Mimms* (434 US 106) which had held that a police officer does not violate a driver's Fourth Amendment rights by ordering him out of a car intercepted for a traffic infraction, we held that a valid investigatory stop may be accompanied, as a protective measure, by a command that all the occupants exit the car or by the officer's uninvited opening of a passenger door. We had earlier held in *People v Moro* (101 AD2d 747) that a police officer could lawfully order a passenger to exit the car following a traffic violation stop. Defendants argued, and Criminal Term agreed, that the police could have used the less intrusive means of requiring defendants to hold their hands in plain view while they inquired of the cabdriver whether anything was amiss. Such was the police procedure in *People v Foster* (83 AD2d 282) until one of the passengers slumped forward in a motion which the officer interpreted as an attempt to hide either a weapon or contraband. However, our decision in *Foster* cannot be read as purporting to delineate the outer limits of reasonable police response to a suspected nighttime highjack robbery of a cabdriver. That particularly low level of intrusion is not the *sine qua non* of a lawful arrest under circumstances of the case now before us involving an encounter with two suspects in the enclosed and darkened confines of a motor vehicle. The United States Supreme Court has observed that a significant percentage of murders of police officers occurs when the officers are making traffic stops *(United States v Robinson,* 414 US 218, 234, n 5). Here,

believing they had a genuine signal of distress, the police were authorized to order these passengers out of the vehicle without exposure to all the obvious dangers to themselves and the driver that delay for a parley might involve. Simply put, if the passengers of a vehicle can be ordered to exit following a traffic infraction by the driver, they surely can be ordered to do so where a driver is believed to be sending a grim and silent signal of menace from his passengers.

(3) *The Search of the Cab's Passenger Area:* In *People v Millan* (69 NY2d 514), the Court of Appeals modified the order of this court following our decision at 118 AD2d 236 by granting a previously withheld suppression hearing, and in doing so rejected our conclusion that a taxicab passenger lacks standing to challenge a search of the rear of the vehicle because it cannot be said, as a matter of law, that he possesses no reasonable expectation of privacy with respect thereto, particularly where the People rely on the statutory presumption of possession in Penal Law § 265.15 (3).* We are therefore obliged to consider the doubts expressed by Criminal Term as to that portion of Officer Biondo's testimony which recounted his finding of the two guns recovered in plain view without conducting any search. Since the testimony was neither impeached nor contradicted, and since the hearing court made no finding of its own on the matter, we exercise our own fact-finding power to adopt it as being entirely consistent with the physical realities, particularly when the limited opportunity available to the occupants of this cab successfully to secrete the two firearms is accorded appropriate weight. The hearing court's reservations might also have embraced Officer Biondo's testimony with respect to the bending and pushing motions that he ascribed to defendants before their vehicle was halted. But, even if that latter testimony were to be fully discounted, we find still remaining a clearly articulable basis for this vehicular stop, which is all that is constitutionally required, as well as sufficient factual and legal justification for all subsequent police action.

Accordingly, the order, Supreme Court, New York County (Jerome W. Marks, J.), entered April 23, 1984, granting defendants' motion to suppress physical evidence, and order (Herbert I. Altman, J.), entered May 11, 1984, dismissing the

---

* While it is by no means clear on this record that at trial the People will rely on the statutory presumption, for the purpose of this discussion we assume it.

indictment, are reversed, on the law and the facts, the indictment reinstated, and the matter remanded to the hearing court for further proceedings.

ELLERIN, J. (dissenting). I cannot agree that the ambiguous circumstance of a taxicab proceeding with its "bright lights up" is a sufficient predicate, without more, to justify a full scale search and seizure of the cab and its passengers. In so holding here, the majority appears to have ignored the carefully crafted standards governing the permissible parameters of police intrusion which are designed to strike a reasonable balance between the government's interest in law enforcement and the predominating constitutional concern with safeguarding the privacy and security of every person against unreasonable searches and seizures. *(People v De Bour,* 40 NY2d 210; *People v Cantor,* 36 NY2d 106.)* Under those standards, the qualitative import of the underlying facts and circumstances known to the police officer at the time he initiates his encounter determines "first whether or not the police action was justified in its inception and secondly whether or not that action was reasonably related in scope to the circumstances which rendered its initiation permissible". *(People v De Bour, supra,* at 215; *People v Stewart,* 41 NY2d 65.)

Thus, here we must look to the knowledge possessed by the police officers in the instant case at the time they initiated their encounter with defendants. According to the testimony of Police Officer Robert Biondo, on November 9, 1983, he together with Officers John Carberry and James Simrod, all members of the "taxi squad" unit and in plain clothes, were on patrol in an unmarked yellow medallion taxicab which was stopped at the corner of 145th Street and Broadhurst Avenue in Manhattan. At about 7:30 that evening, Biondo, who was seated in the driver's seat, glanced at his rearview mirror and observed a livery cab proceeding eastbound on 145th Street with its high beam lights on. Recognizing this as a signal used by cabdrivers when in need of assistance, the police vehicle immediately began following the livery cab, and by honking the horn, flicking the bright lights on and off and flashing a red FBI signal light on top of the dashboard, directed the cab to pull over to the curb.

Biondo claimed that after the lights and signals in his vehicle were activated, the two passengers in the rear seat of the livery cab allegedly made "furtive" movements—defendant Davis looking over his right shoulder two or three times,

making "eye contact" with Biondo, and then making a "quick forward bending motion", while defendant Harris, after looking over his shoulder, made a jamming motion with his right hand.

When the livery cab stopped and pulled over to the curb in response to the signals of the police occupied taxicab, the three police officers, with guns drawn and badges displayed, surrounded the cab, opened the passenger doors, and immediately ordered the two passengers out. Significantly, the officers made no inquiry of the driver, nor did they order him to leave the vehicle. Biondo asserts that after the passengers exited, he looked into the rear of the cab and saw the handle of a gun protruding from beneath the driver's seat and that he also observed another gun handle sticking out of the crack between the rear seat cushion and the rear back cushion where Harris allegedly had been sitting.

The cabdriver was unavailable to testify on the date of the hearing and the parties stipulated that, if called as a witness, he would testify as he had before the Grand Jury. As is relevant here, the driver had stated that he did not know whether or not his high beam lights were on, but that he did not intentionally put them on, nor was he in distress at the time. It may also be noted that there was no testimony, or intimation, that as they approached the cab the officers were in any fear for their own safety or that the defendant passengers posed a danger to them.

The testimony of Officer Biondo established that the initial police action directing the livery cab to pull over and stop was prompted solely by the fact that the cab was traveling at night with its high beam lights on and that such was known to sometimes be used by cabdrivers as a distress signal. While the majority refers to "one continuous and rapidly unfolding transaction", implying that additional facts emerged after the police signaled the cab to stop which would justify the subsequent seizure of the cab and its passengers, the record indicates that the only additional factor was the alleged observation by Biondo of certain "movements" made by the defendants in the back of the livery cab. This testimony was viewed by the trial court with understandable scepticism,* and, in-

---

* Significantly, this same team of undercover police officers (Biondo, Carberry and Simrod) have given remarkably similar testimony in previous cases, even down to the detail of the defendant's making "eye contact". *(People v Judge,* 117 Misc 2d 912; *People v Bay,* NYLJ, Dec. 11, 1984, at 7,

deed, the majority itself asserts that its conclusion as to the over-all propriety of the police action in this case does not rest upon the reference to the defendants' alleged "movements" and it is emphasized that the conclusion would be the same even if this aspect of the police testimony "were to be fully discounted". What is significant, however, is that once the livery cab was directed by the police vehicle to pull over and stop it did so promptly and no attempt was made to flee nor was any other untoward conduct exhibited indicative of criminality.

In *People v De Bour (supra)*, the Court of Appeals delineated with sensitive precision the still controlling standards governing the gradations of permissible police intrusion which, in any given case, are dependent upon the weight and import of the underlying precipitating facts and circumstances known to the police officer at the time he undertakes to act. It is emphasized therein, and bears repetition, that consistent with our constitutional protections there is never a justification for intrusion on the security and privacy of an individual which "is undertaken with intent to harass or is based upon mere whim, caprice or idle curiosity" (at 217).

It is only where a police officer has some objective credible reason, not necessarily indicative of criminality, that the first level minimal intrusion of approaching an individual to request information is permissible. "The next degree, the common-law right to inquire, is activated by a founded suspicion that criminal activity is afoot and permits a somewhat greater intrusion in that a policeman is entitled to interfere with a citizen to the extent necessary to gain explanatory information, *but short of a forcible seizure*" (*People v De Bour, supra,* at 223; emphasis added). It is only where the police entertain a reasonable suspicion that a particular person has committed, is committing or is about to commit a crime, that a forcible stop and detention of that person is permitted, with a corollary right to frisk *if* the officer reasonably suspects that he is in danger of physical injury from the detainee *(supra)*.

col 1.) Courts have registered increasing concern over the "stock testimony" of police officers in the "Taxi Squad" regarding furtive gestures and eye contact by livery cab passengers giving rise to suspicion of criminal activity. This has been criticized as tailored testimony to mask a course of conduct of regularly stopping vehicles in Harlem and upper Manhattan without probable cause in the hopes of finding contraband *(e.g., People v Ocampo,* 129 Misc 2d 217; *People v Castro,* 125 Misc 2d 15; *People v Bay, supra).*

Viewing the factual predicate in the instant case within that framework, it can be said to have provided, at most, a founded suspicion that criminal activity was afoot which was sufficient to justify a stop for purposes of obtaining explanatory information. It fell far short, however, of the necessary foundation to justify police conduct, such as took place here, which constituted a full scale search and seizure. *(People v Allende,* 39 NY2d 474; *People v Ingle,* 36 NY2d 413.)

The majority properly notes that the circumstances of the livery cab proceeding with its high beam lights on must be viewed from the vantage of the police officers in determining whether their subsequent conduct was appropriate. The fact that the officers knew that high beam lights were sometimes used by cabdrivers as a distress signal was certainly a circumstance warranting further explanation. However, such signal standing alone, notwithstanding its grandiloquent characterization by the majority as a "grim and silent signal of menace", was an ambiguous circumstance since, as the hearing court noted, high beam lights are also known to be frequently used to produce greater visibility in the darkness or, as was here ultimately shown to be the case, such lights have been known to be switched on inadvertently.

The probable cause which stems from the commission of a traffic offense, the predicate for the police action in the cases cited by the majority, is of a far different character than the equivocal signal here present which was subject to varying noncriminal interpretations. Nor could the various alleged innocuous "movements" of the passengers, even if considered, be used as an indicator of criminal behavior, as the People urge. Any person traveling in a livery vehicle which is being followed closely behind by another taxicab with lights flashing and horn honking, could reasonably be expected to look over his or her shoulder and make various nervous movements. Behavior which is susceptible of innocent as well as culpable interpretation, such as the high beam light signal or the movements by the passengers here described, cannot be said to constitute probable cause *(People v Davis,* 36 NY2d 280) or a reasonable suspicion that a crime is being committed. *(People v Allende, supra.)*

A simple inquiry directed to the driver of the livery cab by any one of the three armed police officers surrounding the cab would have elicited the fact that the high beam signal was not intended to communicate "distress". Yet, despite the officers' supposed concern for the driver's safety, they did not once

focus their attention upon him. Indeed, no inquiry was made of the driver at all, either to ascertain his well-being or to confirm the suspicions allegedly aroused because of the supposedly purposeful activation of the high beam lights. The majority cautions about the dangers that a "delay for a parley" might entail, but a reasonable assessment of the attendant facts and circumstances here present at the time the officers approached the vehicle do not support such concern. Notwithstanding that the cab was proceeding at night with its high beam lights on, the accompanying facts that it was not speeding when it was first sighted by the police officers, that it was promptly brought to a stop in response to the police signal to do so, that there had been sufficient light to see the alleged "movements" of the passengers prior to the stop, that there were no untoward or threatening acts by any of the occupants, and that there was a complete absence of testimony regarding any fear on the part of the officers for their safety, all emphasize that the immediate, peremptory search and seizure of the passengers and passenger area of the cab were wholly unwarranted and constituted an unreasonable and unjustifiable intrusion upon defendants' Fourth Amendment rights. That the police ultimately recovered guns as a result of a search that was unjustified at its inception cannot thereafter serve to validate that search. *(People v De Bour,* 40 NY2d 210, *supra.)* A disturbing import of the majority's holding here is that it allows precisely such an impermissible "validation" of a constitutionally infirm search and seizure.

The police in the instant case could properly have stopped the livery cab for purposes of making an inquiry and obtaining information from the driver as to the significance of the lights, but in the absence of any further indication that a crime had taken place or was about to take place, there was no justification for the intensity of the police confrontation, or the degree of intrusion which took place here. *(See, People v Howard,* 50 NY2d 583; *People v Bronston,* 68 NY2d 880.) While the nature and location of the area where a subject is detained has been held to be one of the factors which may be considered in determining whether, in a given case, the police acted reasonably *(People v Bronston, supra),* that fact must not be allowed to be improperly utilized as a justification for untoward or excessive police behavior against those of our citizens who happen to live, work or travel in what are characterized as "high crime areas". Unfortunately, it would

appear that in the instant case it is being so used. To permit that factor to bootstrap into probable cause what was, realistically, no more than an objective credible reason for the police to approach and request information, or, at most, a founded suspicion that criminal activity was afoot activating the common-law right to inquire, is to impermissibly render impotent for many of our citizens the constitutionally founded right to be secure against unreasonable searches and seizures.

Accordingly, the order suppressing the physical evidence should be affirmed. The facts observed by these police officers do not establish a predicate sufficient to justify their subsequent actions particularly with respect to ordering the defendants out at gunpoint and immediately undertaking a search of the area of the vehicle where defendants had been sitting, leading to an improper seizure of the physical evidence.

SANDLER, J. P., and ROSS, J., concur with WALLACH, J.; ROSENBERGER and ELLERIN, JJ., dissent in an opinion by ELLERIN, J.

Order, Supreme Court, New York County, entered on April 23, 1984, and order of said court, entered on May 11, 1984, reversed, on the law and the facts, the indictment reinstated, and the matter remanded to the hearing court for further proceedings.